Abraham BARKSDALE, Jr., et al.,
Plaintiffs,

v.

SPRINGFIELD SCHOOL COMMITTEE:
Charles V. Ryan, Jr., Theodore E. Di-
mauro, Romeo J. Cyr, Rosemarie Cough-
lin, Vincent Dimanoco, Mary M. Lynch,
Wilbur J. Hogan, Members of the
Springfield School Committee, Dr. Jo-
seph T. McCook, Superintendent of
Schools of the City of Springfield, Mas-
sachusetts, Defendants.

Civ. A. No. 64–8–S.

United States District Court
D. Massachusetts.

Jan. 11, 1965.

Supplemental Order Jan. 19, 1965.

Henry Weissman, Springfield, Mass.,
J. Clifford Clarkson, Springfield, Mass.,
Robert L. Carter, Barbara A. Morris,
Joan Franklin, New York City, Herbert
Reid, Washington, D.C., for plaintiffs.

James L. Allen, City Sol., John J.
O'Connor, Associate City Sol., Spring-
field, Mass., for defendants.

SWEENEY, Chief Judge.

This class action was brought in behalf
of the minor negro children who reside in

the City of Springfield, Massachusetts. They seek 1) a declaratory judgment that the defendants, by assigning plaintiffs to racially segregated schools, are denying to the plaintiffs their rights under the Fourteenth Amendment to the Constitution of the United States, and 2) an injunction to bar the defendants from continuing to violate these rights.

The Springfield school system is composed of fifty schools, including four high schools, grades 9–12 (which are not involved in this action); eight junior high schools, grades 7–9; thirty-seven elementary schools, K–6; and one elementary school, K–2. The elementary and junior high schools are organized on the neighborhood plan. Some of them, as will be shown, have a heavy concentration of negro children, while others are attended by only white children. It is the contention of the plaintiffs that the racial imbalance in some of the schools is segregation in the constitutional sense, and within the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); and that continued adherence to the neighborhood policy is tantamount to a law compelling segregation. The plaintiffs claim also that the defendants have deliberately drawn district lines and assigned pupils so as to segregate them by race.

I find that there is no deliberate intent on the part of the school authorities to segregate the races. If segregation exists, it results from a rigid adherence to the neighborhood plan of school attendance.

To the credit of the City of Springfield and its school authorities, the School Committee recognized, in September 1963, that racial imbalance did exist in some schools, "that integrated education is desirable," and it resolved to "take whatever action is necessary to eliminate to the fullest extent possible, racial concentration in the schools within the framework of effective educational procedures." Accordingly, it voted to take immediate action to prepare, by March 1964, proposals designed to solve the problem. Unfortunately, this law suit intervened and the defendants discontinued whatever work they had been doing pending the outcome of this litigation.

Since the latter part of the nineteenth century, attendance at elementary and junior high schools in Springfield has been organized on the neighborhood plan. District lines are drawn with reference to the location and capacity of the various schools and take into account the safety and convenience of the children in going to and from school. In general, children are required to attend the school within the district in which they live. While there are exceptions to this rule in a few optional areas, and where transfers are permitted when schools are overcrowded, I find that these exceptions are not designed or used to segregate the children by race. I find further that district lines have been drawn in conformity with the criteria mentioned above and not in order to segregate children by race.

However, segregation in the sense of racial imbalance, exists in the Springfield school system. While the experts did not agree on what constitutes racial imbalance in general, or in Springfield in particular, it is unnecessary to define the term. In the light of the ratio of white to non-white in the total population in the City of Springfield, I do find, however, that a non-white attendance of appreciably more than fifty per cent in any one school is tantamount to segregation. Although several members of the School Committee denied any knowledge of racial patterns and racial concentration in housing and, consequently, in the schools, census data and statistics compiled by employees of the school department at the request of the School Committee indicate that at least seven elementary schools and one junior high school have a majority of negro or negro and Puerto Rican students, while other schools are one hundred per cent white. Following is a percentage breakdown by race of students attending each elementary and junior high school.

| | White | Negro | Others |
|---|---|---|---|
| **Elementary** | | | |
| Glenwood | 100 | —— | —— |
| Glickman | 100 | —— | —— |
| Harris | 100 | —— | —— |
| Myrtle Street | 100 | —— | —— |
| Sumner Avenue | 100 | —— | —— |
| Tiffany | 100 | —— | —— |
| Brunton | 99.8 | .2 | —— |
| Kensington Avenue | 99.8 | .2 | —— |
| Liberty | 99.8 | .2 | —— |
| Sixteen Acres | 99.8 | .2 | —— |
| North Branch | 99.7 | .3 | —— |
| Washington | 99.6 | .4 | —— |
| White Street | 99.5 | .5 | —— |
| Bowles | 99.1 | .9 | —— |
| Greenaway Drive | 98.8 | 1.2 | —— |
| Armory Street | 98.6 | 1.1 | .3 |
| Pottenger | 98.6 | 1.4 | —— |
| Talmadge | 98. | 2. | —— |
| Warner | 98. | 2. | —— |
| Indian Orchard | 95.3 | 4.7 | —— |
| Acushnet | 95.1 | 3.7 | 1.2 |
| Balliet | 95. | 5. | —— |
| Lincoln | 92.4 | 6.3 | 1.3 |
| Dorman | 92.1 | 6.8 | 1.1 |
| Morris | 89.7 | 10.3 | —— |
| Jefferson | 88.2 | 6.2 | 5.6 |
| Memorial | 83.5 | 16.5 | —— |
| Howard Street | 73.4 | 21.6 | 5. |
| Brightwood | 66.3 | 28.3 | 5.4 |
| School Street | 65.4 | 15.9 | 18.7 |
| Homer Street | 54.1 | 45.9 | —— |
| Brookings | 44.8 | 55.2 | —— |
| Carew Street | 41.4 | 20.3 | 38.3 |
| Ells | 41. | 59. | —— |
| Tapley | 24.7 | 75.3 | —— |
| Hooker | 17.7 | 48.3 | 34. |
| Eastern Avenue | 15.2 | 84.8 | —— |
| Deberry | 9.8 | 89.9 | .3 |
| **Junior High Schools** | | | |
| Forest Park | 99.8 | .2 | —— |
| Van Sickle | 99.8 | .2 | —— |
| Kiley | 98.4 | 1.6 | —— |
| Duggan | 97.5 | 2.5 | —— |
| Myrtle Street | 96.2 | 3.8 | —— |
| Classical | 84.5 | 15.5 | —— |
| Chestnut Street | 78.4 | 14.9 | 6.7 |
| Buckingham | 37.1 | 62.9 | |

The total elementary school enrollment for the 1963–64 school year was 19,417, of which 15,588 or 80.3% were white; 3,386 or 17.4% were negroes and 443, or 2.3% Puerto Rican. This latter group is not involved in this action and will be disregarded for the purposes of this opinion. Of the 3,386 negroes in all of the thirty-eight elementary schools, all but 595 are enrolled in eight of them; i. e., the Homer, Hooker, Brookings, Deberry, Eastern Avenue, Ells, Tapley and Carew Schools.

Of the 6,546 students enrolled in the eight junior high schools, 946 are negroes. 702 of that number are enrolled in the Buckingham Junior High School and 117 in the Chestnut Junior High School, making a total of 819. The remaining 127 pupils of the junior high schools are distributed through the other six junior high schools. Incidentally, of 52 Puerto Rican junior high school students, all are enrolled in the Chestnut Street Junior High School.

From the evidence, I find that those schools in which the vast majority of negro students are enrolled consistently rank lowest in achievement ratings based on the Iowa Test of Basic Skills. Those students, when transferred to other schools, had difficulty keeping abreast with their contemporaries. Special programs in science and French for gifted children who have attained a high achievement level have had few, and sometimes no, negro participants.

While it is not possible to determine how much of this is the result of home environment and how much is attributable to schools and teachers, these facts, nonetheless, bear out the testimony of the plaintiffs' expert, Dr. Thomas F. Pettigrew, that racially imbalanced schools are not conducive to learning, that is, to retention, performance, and the development of creativity. Racial concentration in his school communicates to the negro child that he is different and is expected to be different from white children. Therefore, even if all schools are equal in physical plant, facilities, and ability and number of teachers, and even if academic achievement were at the same level at all schools, the opportunity of negro children in racially concentrated schools to obtain equal educational opportunities is impaired, and I so find.

The defendants argue, nevertheless, that there is no constitutional mandate to remedy racial imbalance. Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963). But that is not the question. The question is whether there is a constitutional duty to provide equal educational opportunities for all children within the system. While Brown answered that question affirmatively in the context of coerced segregation, the constitutional fact—the inadequacy of segregated education—is the same in this case, and I so find. It is neither just nor sensible to proscribe segregation having its basis in affirmative state action while at the same time failing to provide a remedy for segregation which grows out of discrimination in housing, or other economic or social factors. Education is tax supported and compulsory, and public school educators, therefore, must deal with inadequacies within the educational system as they arise, and it matters not that the inadequacies are not of their making. This is not to imply that the neighborhood school policy per se is unconstitutional, but that it must be abandoned or modified when it results in segregation in fact. Blocker v. Board of Education of Manhasset, New York, 226 F.Supp. 208 (E.D.N.Y.1964) Branche v. Board of Education, 204 F.Supp. 150 (E. D.N.Y.1962), Jackson v. Pasadena City School District, 59 Cal.2d 876, 31 Cal. Rptr. 606, 382 P.2d 878 (1963), Taylor v. Board of Education, 191 F.Supp. 181, 187 (S.D.N.Y.) (dictum) aff'd 294 F.2d 36 (2d Cir.) cert. den. 368 U.S. 940, 942, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). I cannot accept the view in Bell that only forced segregation is incompatible with the requirements of the Fourteenth Amendment, nor do I find meaningful the statement that "[t]he Constitution * * does not require integration. It merely forbids discrimination." 324 F.2d at

213.[1] In view of the disparity in population and school attendance, there cannot be equal representation of white and negro students in each school, but there must be no segregated schools.

■ This court recognizes and reiterates that the problem of racial concentration is an educational, as well as constitutional, problem and, therefore, orders the defendants to present a plan no later than April 30, 1965, to eliminate to the fullest extent possible racial concentration in its elementary and junior high schools within the framework of effective educational procedures, as guaranteed by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. The plaintiffs shall aid the formulation of a plan with expert assistance and otherwise insofar as the defendants request such aid. The court retains jurisdiction of this cause until a plan has been formulated, approved by the court, and implemented.

The foregoing opinion constitutes the Findings of Fact, Conclusions of Law, and Order of the Court.

## SUPPLEMENTAL ORDER

The defendants having moved the Court to amend its Opinion and Order of January 11, 1965, and for a stay of proceedings, the Opinion and Order are hereby supplemented nunc pro tunc by the addition of the following:

This order does not, under the holding of Taylor v. Board of Education of City School District of City of New Rochelle, 288 F.2d 600 (2d Cir. 1961), constitute an appealable final decision; but in my opinion it involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal therefrom may materially advance the ultimate termination of this litigation. 28 U.S.C. § 1292(b).

The order directing the defendants to present a plan no later than April 30, 1965, is stayed pending the determination of the questions raised under section 1292(b).

---

1. For an analysis of the antecedents and history of this statement see Blocker

v. Board of Education, supra, 226 F.Supp. at p. 221.