Tina **DEAL**, a minor, by Frank L. Deal, her father and next friend, et al., Plaintiffs,

v.

The **CINCINNATI BOARD OF EDUCA- TION** et al., Defendants.

Civ. A. No. 5483.

United States District Court
S. D. Ohio, W. D.

July 26, 1965.

---

Robert L. Carter, Barbara A. Morris, Lewis M. Steel, New York City, Norris Muldrow, Calvin C. Johnson, Cincinnati, Ohio, for plaintiffs.

William A. McClain, City Sol., Philip S. Olinger, Asst. City Sol., C. R. Beirne, Sp. Counsel for Cincinnati Bd. of Ed., Robert E. Manley, Cincinnati, Ohio, for defendants.

JOHN W. PECK, District Judge.

This is a class action brought by Negro children through their parents and next friends complaining of alleged racial imbalance in Cincinnati public schools.

After repeated informal and pretrial conferences between the Court and counsel, numerous hearings on preliminary motions (including one for summary judgment), and unusually exhaustive discovery procedures, this cause came on for trial. Prior thereto plaintiffs had been unsure as to which experts they would call and what areas would be covered by their testimony and trial was entered into under an agreement providing that plaintiffs would present their entire case, defendants would present their entire case except for responsive expert testimony, whereupon trial would be continued to an agreed date at which later time defendants' experts' testimony and plaintiffs' rebuttal would be received.

At the conclusion of plaintiffs' case, defendants moved for judgment, and it is that motion which is presently under consideration. Upon its making, the motion was extensively argued orally, and has since been thoroughly briefed by counsel. Subsequent to that oral argument, and in accordance with the previous agreement, defendants presented their "factual" case (i. e., their entire case except for expert testimony), but nothing contained therein is before the Court for purposes of the present motion and will not hereinafter be taken into account.

The Amended Complaint lists as plaintiffs 96 (including 52 intervenors) "minor citizens of the State of Ohio," suing through their parents and next friends "on their own behalf and on behalf of thousands of [other] Negro minors within the school district of Cincinnati, who are similarly situated because of race and color." The Cincinnati Board of Education, its superintendent and the individual members of the Board are named defendants. For present purposes, the eleven paragraphs of the prayer of the Amended Complaint may be fairly summarized by setting forth one of them:

"(3) That defendants be further enjoined from operating and providing racially segregated public schools, assigning plaintiffs, and the members of the class they represent, to racially segregated schools, and seeking to further extend existing patterns of racial segregation."

The Amended Answer to the Amended Complaint permitted to be filed over plaintiffs' objections at trial (Transcript of Proceedings [hereinafter designated by "T."] 5–6; T. 325) "generally" denies the essential allegations of the Amended Complaint, specifically denies that plaintiffs have suffered damage, injury or irreparable harm or that they have any real interest in this action, and avers that the "real party in interest is the National Association for the Advancement of Colored People, which is responsible for the commencement of this action and has maintained and controlled it on behalf of the plaintiffs since its commencement;" denies any "good faith" effort to negotiate the issues on the part of plaintiffs, while averring such negotiation by defendants; and denies the jurisdictional right of this court to consider the issues presented in this action because of the failure of plaintiffs to exhaust their administrative remedies under Ohio law.

From the time of our earliest contact with this case an earnest effort has been made to elicit from counsel an agreed statement of the issue[s] and to cause

the case to be placed in posture for submission by stipulation supplemented by expert testimony.[1] Some indication of the difficulties encountered in attempting to define the issues and eliminate superfluous testimony is indicated from the following statement contained in our Memorandum Opinion filed March 9th, 1965, disposing of defendants' Motion for Summary Judgment:

"[T]he motion will be overruled on the narrow ground that defendants have failed to establish that there is no genuine issue as to any material fact which can be satisfactorily isolated from the whole of the rambling, rhetorical Amended Complaint.

"This is not to say, however, that we are in agreement with plaintiffs' further argument that this conglomeration of allegations constitutes a 'one-count' cause of action. We cannot agree with this because in spite of the many, many hours that have been spent in hearings, conferences with counsel and in reviewing the myriad pleadings, motions, answers to interrogatories, objections, exceptions, depositions and exhibits (with an aggregate bulk of many pounds) we have yet to be advised as to what that 'one-count' is. A comment from our Memorandum Opinion of August 4th, 1964, is as appropriate now as it was then:

" 'As a matter of fact, even at this late date in this action which has consumed countless hours of the time of all concerned the issues continue to be clouded and obscure.'

"In view of the proximity of the pretrial conference, it seems pointless to here comment further on the difficulties which have been encountered in attempting to get this cause squarely at issue. Counsel have been asked time after time what single fact in this entire matter is not readily capable of stipulation, but no affirmative response has ever been made."

Monumental effort on the part of counsel did, in fact, result in great progress in the area of stipulation, and at the time of the pretrial conference April 9, 1965, it appeared probable that the entire factual presentation could be so presented. However, counsel for plaintiffs then advised that in addition to the stipulations and expert testimony, they proposed to call the individual defendants and various employees of the Board of Education as on cross-examination. We immediately advised that while no doubt existed as to their right (as distinguished from advisability of doing so) to call parties as on cross-examination, in the absence of clear authority employees other than managing agents could not be so called. At that conference we ineffectively suggested that from plaintiffs' point of view stipulations could not reasonably be expected to be strengthened by cross-examinations of the Board's members and its superintendent, and that explanations weakening the stipulations might well be forthcoming.

---

1. Receipt of such testimony was vigorously resisted by defendants, and while expert testimony has been received in other cases of this nature (See, e.g., Northcross v. Board of Education, 333 F.2d 661 (6th Cir. 1964), cert. denied, 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810 (1964); Kelley v. Board of Education, 270 F.2d 209 (6th Cir. 1959), cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959); Dowell v. School Board, 219 F.Supp. 427 (W.D.Okla.1963); Blocker v. Board of Education, 226 F.Supp. 208 (E.D.N.Y.1964); Barksdale v. Springfield School Committee, 237 F.Supp. 543 (D.

C.Mass.), rev'd 348 F.2d 261 (1st Cir. 1965); Bell v. School, City of Gary, Indiana, 213 F.Supp. 819 (N.D.Ind.) aff'd, 324 F.2d 209 (7th Cir.), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1963)), no reported case indicates such an objection or the ruling thereon. In the absence of controlling authority, the Court here took the position throughout that objection to such testimony went rather to the weight than to the admissibility of the testimony (e.g., T. 318, 322, 325 and 352), and overruled the objections.

Parenthetically, we offer the comment that the latter did in fact occur.

The question of the right of plaintiffs to call Board employees not parties hereto as on cross-examination was raised squarely when plaintiffs called one John Shreve (then not otherwise identified). The record reflects the following (T. 217B–219):

"JOHN SHREVE

"called as a witness by Plaintiffs, being first duly sworn, was examined and testified as follows:

"Mr. STEEL: Your Honor, I call Mr. Shreve as an adverse witness under Rule 43(b).

"THE COURT: That will be denied.

"MR. STEEL: Excuse me, Your Honor.

"THE COURT: That request will be denied.

"MR. STEEL: Can I have the basis of that ruling, Your Honor?

"THE COURT: Yes, you may.

"The basis of the ruling is that 43 (b), of the Federal Rules of Civil Procedure, provides that: 'a party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation,' and so forth, as on cross-examination.

"It is the holding of this Court that this witness at this time does not fall within any of the permissive portions of that rule to permit his cross-examination by counsel for the Plaintiff.

"MR. STEEL: Your Honor, I note an objection to that ruling, and urge the arguments that I made in my pretrial brief.

"THE COURT: For the further information of counsel I will make this additional explanation as I did to counsel at the time of the last pretrial conference.

"I would in any event with reference to a private corporation not at this stage of the proceedings, permit the calling of this witness as on cross-examination, on the ground that he is not a managing agent.

"However, I further point out, as I did to counsel on the record in the pre-trial conference that we are here dealing not with persons who are employed in a private capacity, but we are dealing with public servants. I take no offense at being called idealistic, if you care to do that, but I have enough idealism to be absolutely convinced, until the contrary is shown, that public servants are just exactly what is connoted by that term. They are serving the public, not an individual master. When as and if this witness, or any other witness called by any party demonstrates hostility, I need hardly say to you that a motion for the right to cross-examine may be made. And until that time occurs, as indicated, the request will be denied."

Shreve's subsequent testimony established him as an assistant superintendent in the Cincinnati school system in the department of special services. However, plaintiffs had themselves already elicited from Wendell Pierce, Superintendent of Schools, the fact that the responsibility for decisons within the school system was his alone and that such responsibility was neither delegated to nor shared by assistant superintendents (T. 130–131). In fact, under Ohio law a superintendent must so assume full responsibility (O.R.C. § 3319.01), and can neither so delegate nor share. The authorities cited by plaintiffs in contending for their right to cross-examine such witnesses are not in point.[2] Plaintiffs then

2. T. 259–260: "THE COURT: The record will indicate [your objection].
 "I will make this comment, as briefly as I can, Mr. Steel.
 "First, none of the authorities which have been cited are in any way controlling on this Court, the cases to which reference has been made dealing with public authorities.
 "Second, the case and line of cases on which you have principally relied, which I understand to be exemplified by Newark

further preserved their record on this point by offering to call three other specified assistant superintendents as "adverse witnesses under Rule 43(b)" and taking exceptions to the denial of such right. (T. 260–263).

One further comment in this general regard seems proper. After the Court's refusal to permit plaintiffs to cross-examine Mr. Shreve, they proceeded through a rather extensive direct examination of him, followed by a thorough cross-examination by defendants. Since plaintiffs had thus made Mr. Shreve their witness, we would be justified in considering them to be bound by his testimony, and adoption of such a position would be fully fatal to plaintiffs' cause. Such position is not here adopted.

One other evidentiary area was denied plaintiffs, and once again the record reflects a ruling consistent with the position indicated by the Court during early, conferences. Plaintiffs called one Dean Clark, a relocation representative for Urban Redevelopment in the employment of the City of Cincinnati (The City is not, of course, a party to this action.). In fifteen pages of testimony (T. 263 et seq.) Mrs. Clark outlined her duties in assisting persons ·dispossessed under Urban Redevelopment programs in obtaining new housing. She then identified (T. 278) a proffered exhibit as "a listing from an investment corporation of both White and non-White vacancies in the city." Following objection to the exhibit, the following colloquy appears; it is quoted at length because both plaintiffs' and the Court's positions are reflected (T. 279–287):

"THE COURT: How does it become material, Mr. Muldrow?

Insurance Company vs. Saratain, 20 F. R.D. 583, are in no way applicable to the present situation, and are thoroughly distinguishable on the facts.
 "Finally, and most basically, this is the ground on which we rely primarily, it has not been shown as was stated in the course of the Court's ruling yesterday that this witness is a managing agent under the contemplation of Rule 43(b).

"MR. MULDROW: It becomes material, sir, from the viewpoint of Negroes being segregated in public housing by public officials.

\*　\*　\*　\*　\*　\*

"THE COURT: The only public officials named in this suit are members of the Cincinnati Board of Education, and the Board. Even conceding that there may have been improper action taken by the City of Cincinnati, or the governor of Arizona, or some other public authority, how do we here become concerned with that?

"MR. MULDROW: We become concerned, Your Honor, because the Board of Education is a public body, and the City of Cincinnati is a public body, being a part of the State of Ohio. And here we have state action which is practicing segregation upon Negroes, and in that respect it is pertinent to the question of whether or not Negroes are segregated in the Cincinnati Public School System, and whether or not they are receiving equal educational opportunities.

"THE COURT: Mr. Muldrow, how could any order that might issue from this Court be binding on any person, private or public, who is not a party to this action and has not had an opportunity to respond, in either a public or private capacity?

"MR. MULDROW: Our position, Your Honor, on that particular question is that we have before this Court an agency of the state, the Cincinnati Board of Education, which is segregating against Negro children; and further that Negro

"You have made reference to Dr. Pierce's testimony. I call to counsel's attention that you elicited from that witness the fact that the responsibility as a matter of both fact and law remained with him.
 "In view of that fact, it cannot be said that this witness is clothed with the authority of a managing agent as that phrase is used in the rules."

children are segregated in housing, and that one part of the state cannot segregate, which will affect another part.

"THE COURT: Mr. Muldrow, I don't want to debate with you what some other agency may or may not do. I am only asking how this Court is empowered to take any action with reference to any individual, private or public, who is not a party to this lawsuit?

MR. MULDROW: The action would be taken against the Cincinnati Board of Education, because we are saying the fact that even though another agency might discriminate, as far as in housing, that this could not be used as a scapegoat for the Cincinnati Board of Education furnishing equal educational opportunity to Negro children.

"The Cincinnati Board has to adjust to segregated housing in order to make equal educational opportunities available to all of its citizens.

"Therefore, an order would be directed to the Cincinnati Board of Education to correct whatever segregation is practiced upon Negro children, even though it might be brought about by another agency. But the Board has to deal with education, and segregated housing affects education. And this is the question, that you cannot get an equal educational opportunity by being confined or restricted to a particular section, and that the Board has power, or can do something about it to correct that segregation.

\* \* \* \* \* \*

"THE COURT: Mr. Carter, in the one or two sessions which you have helpfully participated in, the pretrial conferences, you contributed very substantially to the forwarding of this matter. The Court stated to you then that while it was all very well to discuss many of the problems that arose in surrounding areas, that unless some disposition could be

made on an amicable basis, if this matter proceeded to trial in an action in which you are seeking the extraordinary relief of injunction, we would find ourselves in a situation where we would be bound by the rules of such a procedure.

"If you care to offer anything on the question I have asked Mr. Muldrow, I would be pleased to hear it.

"MR. CARTER: I would, if it please the Court.

"What is being attempted to elicit from this witness is the fact that in a city agency relocating families, that the—in the assistance in relocating families, that the agency uses as a part of its information for relocation, lists in which properties are restricted on the basis of race, in assisting persons in finding houses.

"Now, this we think—we think, Your Honor, that this is a part of —we are attempting to show to the Court in some measure the participation of a public agency, not the Board of Education, but another public agency, in the residential segregation which exists in the City of Cincinnati, and \* \* \* on the basis of which the School Board indicates that this is reason, because of housing segregation, geographical segregation, is the reason for the maintenance of the schools which we say are segregated schools.

"Now, it is true, of course, that the Court will not—need not make an inference on the basis of that, that this is a responsibility of the Board of Education. But our view of it is that this is a part of the picture which we think the Court should see and should view and should understand in coming to its conclusion in regard to whether this is or is not a violation of the Fourteenth Amendment; and for these reasons we are attempting to elicit from the witness the procedure in regard to relocation. I understand this wit-

ness doesn't go out * * * and find houses, but we are attempting to establish that as part of the process a restricted list is used and is made available to the persons who are relocated by the city, which we think adds to segregation.

"This is the purpose or the intent of this testimony.

"THE COURT: Mr. Carter, the difference between us, and the point that I was attempting to make a few moments ago, is that I fail to see how it becomes material and proper evidence in this case to indicate transgressions or wrongdoings that may have been perpetrated by some other individual or agency.

"For example, I think it might be even entirely arguable that the actions of the governor of Alabama may have had some influence on some people in this district. We recently had within the Southern District of Ohio a national meeting of the Ku-Klux Klan. I am sure that you would not suggest that any evidence with reference to that matter could be brought into this courtroom.

"I strongly suggest to you, gentlemen, that the difference is only one of degree. You are picking an agency of the City of Cincinnati, which is entirely separate legally and factually, from the individual Defendants, as well as the defendant entity of the Board in this case.

"I suggest that the fact that there is some geographical proximity does not mean there is any reason for permitting whatever this lady's agency may or may not have done improperly come into this case.

"MR. CARTER: Your Honor, * * * we are not attempting to put Mrs. Clark on trial as a defendant. What we are really attempting to do for the Court was to elicit from her some facts in regard to the relocations of persons, which we think would add to the Court's un-

derstanding and knowledge of the problem. We think that the problem, that part of the problem—and I think that it is going to be demonstrated, or that the Defendants are going to say that the problem is not any direct action that they do, but the problem is * * * basically one of segregated housing.

"THE COURT: Mr. Carter, we are exactly back to where we started. I am referring to the statement that I made to you when you were first in Cincinnati a year or so ago, that if we are in an injunctive proceeding we must be bound by the rules controlling an injunctive proceeding in the United States District Court. That does not in my conception extend to embracing and hearing transgressions by agencies other than those named in the complaint.

"MR. CARTER: I understand that, Your Honor, but I understood that Your Honor had indicated that to me at the time, that by bringing in other people, that we were bound by the rules. Of course, we recognize that. However, it is my feeling in terms of the whole evidence of what produces, or what causes or what is the basis of what we call segregated schooling here, that this is part of the evidentiary facts which we think we should present to the Court. And particularly we think it is a part of the evidentiary fact, that a part of this is produced by an agency of the City of Cincinnati.

"We respectfully submit that this isn't the same case as the governor of Alabama. I think that the governor of Alabama's action, or the Ku-Klux Klan is more tenuous action. We think here we have a direct agency involved, which is a public agency in the same city as the School Board, which helps create this situation. And this is the reason we want this evidence in.

"THE COURT: Gentlemen, I permitted this to be gone into a little

more fully at this time than might otherwise be justified, but I wanted the counsel to understand the Court's position. I think that I understand your position.

"The objection to the Plaintiff's Exhibit Number 1 for identification at the present time will be sustained, subject to the right of the Plaintiffs to reoffer the exhibit when and if it is shown to have some connection with the Defendants in this case."

 It is here held that in an action against a board of education charging segregation or failure to desegregate pupils in the school system such board is in no way responsible for action taken or omitted by other public or private agencies or entities and that evidence thereof is not admissible in such action. On that ground the denial of admissibility of the Clark exhibit is reaffirmed and similar reaffirmance is made of other rulings at trial concerning evidence proffered as to actions taken or omitted by non-parties hereto on the same basis.

 The conferences referred to in the colloquy between Mr. Carter and the Court occurred before the case was even technically at issue, and at a time when settlement of the issues between the parties, aided as they have been throughout by capable and cooperative counsel on both sides of the table, appeared entirely possible. At that time areas of discussion were entered into in chambers (and, we were given to understand, even more extensively at conferences in which we did not participate), and this was the reason for our cautioning comment. We conceive any subject to be a proper one for discussion during negotiation that might lead toward settlement of any lawsuit, but that is far from saying that evidence thereof is necessarily admissible. As we have repeatedly attempted to point out, that is particularly true in a case (1) involving broad social concepts (2) in which the extraordinary remedy of injunctive relief is sought. In our considered judgment it is far too easy to be led down the primrose path of platitudes and generalities when discussing such social evils as are claimed to underlie the present cause, and to forget that that path must end at the courtroom door. Once that threshold is crossed, a forum has been entered in which a plaintiff must clearly prove his case if he is to be afforded the extraordinary relief he seeks in a court of equity. (Goldammer v. Fay, 326 F.2d 268, 270 (10th Cir. 1964); Allen v. Pyrene Mfg. Co., 111 F.Supp. 819 (D.N.J. 1953); 43 C.J.S. Injunctions § 192 (1955); 28 Am.Jur. Injunctions, section 25 (1959)).[3]

Turning, then, from the temptation to let sympathy substitute for testimony and perhaps to let inclination prevail over precedent, and having examined what plaintiffs have *not* been able to establish, let us examine what they have in fact established on the record.

At the opening of trial, an agreed and executed stipulation was received in evidence, as were 249 exhibits detailed in it. That Stipulation is a meticulously prepared document consisting of 71 pages, exclusive of 24 pages of carefully arranged Contents and lists of exhibits. Without this document, and the agreements as to exhibits, presentation of plaintiffs' case alone could well have ex-

3. On a previous occasion we expressed that thought in this manner (Memorandum Opinion filed August 4, 1964):

"At the request of the attorneys for the parties to the action, on two occasions conferences have been held in chambers with all representatives present and general discussions have been held. Necessarily and appropriately these discussions have gone into subject matters concerning which we have no official power to act, but the doors of our offices will always remain open if all concerned are of the opinion that our participation may be of any assistance. However, when we move from the conference table to the court room we regress to the narrow limits established by the pleadings and it is for that reason that emphasis is placed on the urgent need for a clarification of those issues."

tended over weeks (if not months) instead of days, and appreciation is expressed for the effort and cooperation of counsel in this achievement. While the parties agree that the 72 separate stipulations are factually accurate, defendants have objected to 49 of them as irrelevant and immaterial, and plaintiffs to one on the same grounds. While these objections in many instances have substantial merit, at this stage of the proceedings it is felt that having all of this material in the record may be of present or future assistance and all of the objections are accordingly overruled.

The record before us establishes the existence of a Cincinnati school system organized on what is known as a 6–3–3 basis; i. e., the elementary schools consist generally of kindergarten and grades 1 through 6, junior high schools of grades 7, 8 and 9, and senior high schools of grades 10, 11 and 12. During the 1964–65 school year there were 72 elementary schools, 16 high schools, 6 comprehensive schools, 1 college preparatory high school, 1 vocational and technical high school, and 9 special schools. This organization is shown by Stipulation 3, which establishes the following student enrollment for the 1964–65 school year:

| | | |
|---|---|---|
| Total in elementary schools | | 55,906 |
| White pupils | 34,122 | |
| Negro pupils | 21,784 | |
| Junior high school total | | 17,163 |
| White pupils | 10,409 | |
| Negro pupils | 6,754 | |
| Senior high school (including college preparatory high school) | | 14,691 |
| White pupils | 10,311 | |
| Negro pupils | 4,380 | |
| | | 87,760 |

The stipulation, largely through its Joint Exhibits, further establishes in great detail the historical background culminating in this tabulation of school population. These Exhibits not only show the general increase of the school population over the years, but establish the racial trends in that population as well. Included are figures showing the racial composition of schools which have been opened and closed and virtually all conceivable data in these areas are supplied. Other Joint Exhibits (many of which are, as hereinabove indicated, of doubtful materiality) contain masses of statistical data, maps of residential areas indicating racial compositions and records establishing facts concerning the employment and placing of Negro and white personnel. In their brief, defendants summarize this portion of the record in the following statement, which we adopt as fair:

> "The Cincinnati Public School System includes a number of schools which are attended almost entirely by Negro pupils, a number of schools attended entirely by white pupils, and a number of schools attended by both Negro and white pupils in various percentages of each of the races; the racial composition of each school is simply a result of the racial composition of the neighborhoods which they serve."

The Stipulation then goes on to establish, again largely through its Joint Exhibits, vast masses of factual material concerning record-keeping practices, curriculum programs and the results of extensive pupil testing operations. To some extent overlapping the areas just mentioned, other Joint Exhibits deal with aspects of many of the individual schools, and with such matters as transportation, the use of temporary buildings, attendance zone patterns, and changes, and generally allied matters. The second phase of plaintiffs' case consisted of the testimony of experts testifying almost exclusively on the basis of the information provided by the Stipulation. Defendants' summary of this phase, which again is adopted as fair, is as follows:

> "A professor of Education from Antioch College and a professor of Sociology from Washington Univer-

sity, St. Louis, both expressed the opinion that 'a racially unbalanced school seriously affects a child's ability to learn.' (T. 371)"

It is the contention of the defendants, and this is supported by the Stipulation, that in the 78 years since segregation was abolished in Ohio in 1887 (84 Ohio Laws 34; Board of Education v. State, 45 Ohio St. 555, 16 N.E. 373 (1888)), Negro students have attended the neighborhood schools on the same basis as white students. The defendant Board has always operated its schools under what is commonly referred to as the "neighborhood plan," which is provided for by Ohio Revised Code, Section 3313.-48, which provides:

> "The board of education of each city, exempted village, and local school district shall provide for the free education of the youth of school age within the district under its jurisdiction, *at such places as will be most convenient for the attendance of the largest number thereof.*" (Emphasis supplied.)

While maintaining that race had not been considered in the selection of sites or the designation of attendance zones theretofore, the Board adopted the following resolution as a statement of policy March 9th, 1964, (Stipulation 11):

> "11. *Defendants' Policy Statement:* On the 9th day of March, 1964 the defendants agreed on a policy as a guide to officers and employees of the Board in selection of sites for schools, establishment of attendance area boundary lines and assignment of pupils. This policy is as follows:
>
> "(1) As a matter of policy, the Board would like to avoid predominantly Negro schools to the extent that the Board has any control over the causes which create such predominance. But in

exercising any control in this area the Board will not deviate from the long established neighborhood school plan or the requirement of Section 3313.48 R.C. that schools be located where they will be most convenient for the largest number of students.

"The Board is willing to make race of students one of the elements to be considered in the establishment of school attendance zone lines so long as this can be done consistently with the neighborhood school policy, the requirements of Sec. 3313.48, and the numerous factors which have always been considered in establishing such zone lines as—safety of children, travel distance and capacity of school.

"(2) The Board does not accept the concept of de facto segregation and will not agree to any proposal to bus students, to transfer classes or any other program to attempt to balance races as such."

The basic issue in this case is perhaps more clearly stated in the concluding paragraph of this policy statement than anywhere else. The gauntlet is clearly therein thrown down, and we turn to a consideration of whether on the case presented by plaintiffs this Court has either the right or the duty to enjoin establishment of any program "to attempt to balance races" in the subject school system.[4]

In a case involving similar issues, a colleague in this Circuit has recently recognized the well established principle that " * * * public officials are presumed to have properly discharged their duties." (Craggett v. Board of Education of Cleveland, 234 F.Supp. 381, 386 (N.D. Ohio 1964, Kalbfleisch, J.)). In support of that proposition, Judge Kalbfleisch cited the following: United States v. Chemical Foundation, Inc., 272 U.S. 1, 47

---

4. At one of the several points at which plaintiffs offer definitions of issues, the following appears (Brief, p. 56): "The issue is whether racial imbalance should be eliminated where it can be done in conformity with sound educational procedures."

S.Ct. 1, 71 L.Ed. 131 (1926); In re State Thread Co., 126 F.2d 296 (6th Cir. 1942); and Donaldson v. United States, 264 F.2d 804 (6th Cir. 1959). This proposition has also been in part at least the basis of determinations sustaining school boards in Bell v. School, City of Gary, Indiana, 213 F.Supp. 819 (N.D.Ind.), aff'd, 324 F.2d 209 (7th Cir.), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1963) (Plaintiffs' contend this case to have been "wrongly decided."); Downs v. Board of Education, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 895, 13 L.Ed.2d 800 (1965); Lynch v. Kenston School Dist., 229 F.Supp. 740 (N.D.Ohio E.D.1964), (appeal to the 6th Circuit Court of Appeals dismissed by plaintiffs-appellants July 2nd, 1965); Northcross v. Board of Education, 333 F.2d 661 (6th Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810 (1964); and Barksdale v. Springfield School Committee, 237 F. Supp. 543 (D.C.Mass.), rev'd, 348 F.2d 261, (1st Cir. 1965).

A careful study of these cases, even read in the light of plaintiffs' arguments and giving special attention to the portions of the opinions on which plaintiffs place emphasis, fails to indicate more than the fact that the courts are giving recognition of the growing awareness of all men of the need to end discrimination in educational as in all other areas. In the present case the moot evidence of the Stipulation and Joint Exhibits alone would have established the increasing tempo of this trend, but plaintiffs added strongly to this showing by their cross-examination of individual defendants. Without exception, in spite of plaintiffs' repeated reference to them as "adverse," these witnesses demonstrated full awareness of and sympathy toward the problems complained of, as well as a knowledge of the intensification of their legal obligation to perform their moral duty in this regard. It would be obtuse in the extreme not to recognize that this action, which would scarce have been given serious attention a decade or two ago, is a product of its times. Indeed, plaintiffs themselves indicate such recognition when they refer to the " * * * changing constitutional interpretations of the Fifth and Fourteenth Amendments to the United States Constitution, as well as provisions of applicable state laws." (Plaintiffs' Brief, p. 4.) Beyond doubt, the courts will not stand idly by and await change by attrition if legal and constitutional rights are shown to have been denied, but in the absence of clear evidence of such denial it is not for the judicial system to be the initiating factor in sociological reform.

■ Reference has hereinabove been made to the extent to which this case has been prepared, and notation is made of the fact that plaintiffs have had unrestricted access to all of defendants' files and records for some two and a half years. Their failure to produce evidence to establish a policy of segregation or gerrymandering on the part of defendants strongly suggests that such practices have not been engaged in. It is here found that plaintiffs have failed to establish a deprivation of rights under the law or under the Constitution of the United States by the requisite degree of proof and that they are therefore not entitled to the relief prayed for in the Amended Complaint. Rule 41(b), Federal Rules of Civil Procedure.

Specific comment should be made concerning two other contentions of the plaintiffs and defendants respectively. First, the conclusion here reached applies as well to plaintiffs' rights under Title 42, United States Code, Section 1983, as to their rights under the Constitution. Second, we do not reach the defense of defendants concerning plaintiffs' alleged failure to exhaust administrative remedies.

The facts are found to be as hereinabove indicated, and this opinion is filed as the Court's findings and conclusions in compliance with Rule 52(a), Federal Rules of Civil Procedure. An order in conformity herewith may be presented.