Mona **BRONSON**, et al.,
**Plaintiffs-Respondents,**

v.

**BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF CINCINNATI, et al., Defendants-Petitioners.**

Nos. 82–3405 to 82–3407.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1982.

Decided Aug. 31, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 30, 1982.

See also, 510 F.Supp. 1251.

---

**3.** "Criminality of Act of Directing to, or Recommending, Source from Which Illicit Drugs May Be Purchased."

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, A. David Nichols, Metzger, Phillipps & Nichols, Cincinnati, Ohio, for plaintiffs-respondents in No. 82–3406.

John A. Lloyd, Jr., Cincinnati, Ohio, for plaintiffs-respondents in No. 82–3405.

Mark A. Vander Laan, James W. Farrell, Jr., Lawrence A. Kane, Jr., Dinsmore & Shohl, Cincinnati, Ohio, for plaintiffs-respondents in No. 82–3407.

Solvita McMillan, Cleveland, Ohio, William E. Caldwell, Elizabeth McKanna, Ratner & Sugarmon, Memphis, Tenn., for defendants-petitioners in all cases.

Thomas Atkins, Teresa Demchak, N.A.A.C.P., New York City, for N.A.A.C.P.

Before LIVELY, Circuit Judge, and WEICK and PHILLIPS, Senior Circuit Judges.

LIVELY, Circuit Judge.

This appeal raises two related questions: (1) Whether collateral estoppel has any application to school desegregation cases; and (2) Whether a finding in a school desegregation case that the defendants did not, prior to July 26, 1965, act with segregative intent in the operation of a public school system may be relitigated because no specific finding was made with respect to May 17, 1954, the date of the decision in *Brown v. Board of Education*. We agree with the district court that principles of collateral estoppel have not been rendered totally inapplicable to school desegregation cases. However, we disagree with the district court's conclusion that the issue of intent prior to July 26, 1965 may be relitigated in this case. Accordingly, we reverse.

## I.

### A.

This is the second interlocutory appeal in an action filed May 29, 1974 which seeks a holding that the public schools of Cincinnati are unlawfully segregated by race. However, this effort did not begin with the 1974 complaint of Mona Bronson. On November 11, 1963 a class action was filed on behalf of "Negro minors within the school district of Cincinnati . . . ." In that action the district court found that the following paragraph from the amended complaint fairly summarized the eleven paragraphs of the prayer:

(3) That defendants be further enjoined from operating and providing racially segregated public schools, assigning plaintiffs, and the members of the class they represent, to racially segregated schools, and seeking to further extend existing patterns of racial segregation.

*Deal v. Cincinnati Board of Education (Deal I)*, 244 F.Supp. 572, 573 (S.D.Ohio 1965). In *Deal I* the district court concluded that "plaintiffs have failed to establish a deprivation of rights under the law or under the Constitution of the United States by the requisite degree of proof," and denied relief. *Id.* at 582.

*Deal I* was affirmed by this court, 369 F.2d 55 (1966), and certiorari was denied by the Supreme Court, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). In affirming the district court this court rejected the claim of the plaintiffs that demonstration of the existence of a racial imbalance in the Cincinnati schools alone was sufficient to show a constitutional violation. Though we affirmed the judgment of the district court "on the issue of racial imbalance not intentionally caused by the Board," this court remanded *Deal I* for "subsidiary findings of fact." *Id.* at 64. The findings were to relate to claims of harm to black students from the racial imbalance found in some schools and claims of discrimination in specific schools and programs. In remanding this court stated:

We have stated above that a showing of impairment of a Negro student's capacity to learn, arising from his school's racial imbalance, does not, standing alone, make out a case of constitutional deprivation. Evidence of such harm, however, may indeed be relevant to the issues of the case before us.

*Id.* at 65.

Following remand, the district judge suggested that the plaintiffs tender an amended complaint or conduct further discovery to establish that new evidence was required to comply with the remand order. After six months of inaction by the plaintiffs the district court filed a memorandum opinion and subsidiary findings of fact. The plaintiffs appealed and this court again affirmed. *Deal v. Cincinnati Board of Education (Deal II)*, 419 F.2d 1387 (1969), *cert. denied*, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). The memorandum and subsidiary findings of the district court were published as an appendix to this court's opinion. 419 F.2d at 1395–1401. Before dealing with the claims of discrimination in specific programs, all of which were rejected, the district court found that "neither gerrymandering nor any other alleged discriminatory practice on the part of the Board brought about such racial imbalance as existed" in the Cincinnati schools. 419 F.2d at 1398.

On appeal from the findings on remand this court held that the district court's findings of fact were not clearly erroneous. In addition to contesting the factual findings of the district court, the plaintiffs argued that the law had been changed since the time of the adjudication in *Deal I* and that recent Supreme Court decisions required reversal of this district court judgment. This court pointed out in its opinion, 419 F.2d at 1390, that the Supreme Court decisions relied upon by the plaintiffs (*Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Raney v. Board of Education of Gould School District*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); *Monroe v. Board of Commissioners of City of Jackson*, 391 U.S.

450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968)) dealt with the duty to desegregate dual systems in which segregation existed because of laws requiring separation of the races in public schools, whereas *Deal* involved the operation of "a long-established unitary" school system. 419 F.2d at 1390. The 1968 Supreme Court decisions dealt with remedies in cases where unconstitutional acts had been established while the *Deal* plaintiffs had never proved the existence of unlawful, *i.e.*, intentional, segregation. Thus, we concluded that intervening Supreme Court decisions in cases where constitutional violations had been established did not affect the validity of the *Deal I* judgment.

### B.

In his remand memorandum following affirmance of *Deal I* the district judge "offer[ed] the view that if there have indeed been intervening occurrences and developments constituting invasions of constitutional rights, they could appropriately form the basis of separate litigation, even though they may not properly be appended to the present action." *Id.* at 1396. After the affirmance of *Deal II* the present class action was filed in 1974 charging the defendants with numerous acts of discrimination and seeking declaratory and injunctive relief. The defendants sought dismissal on the ground that the final judgments in *Deal I* and *Deal II* barred relitigation of the issues raised in this case. The district court refused to apply strict res judicata principles, but determined that the doctrine of collateral estoppel should apply to foreclose "relitigation of essential facts or issues which were previously litigated by the parties (or their privies) and judicially determined." This court granted an interlocutory appeal and affirmed the district court. *Bronson v. Board of Education*, 525 F.2d 344 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976).

In deciding the first interlocutory appeal this court reviewed the holdings of *Deal I* and *Deal II*. The claim of the *Bronson* plaintiffs that intervening decisions of the

Supreme Court had changed the law so as to render collateral estoppel inapplicable to this case was again specifically rejected. 525 F.2d at 347–48. This court pointed out that the Supreme Court had continued to observe the difference between *de jure* and *de facto* segregation in *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In *de facto* cases there must be a finding that intentional acts or omissions of the school authorities produced a segregated condition in public schools. A total lack of intent to segregate the Cincinnati schools had been found by the district court in *Deal*, and this finding had been upheld by this court. No intervening decisions of the Supreme Court had mitigated the effect of this finding. Thus this court applied the collateral estoppel rule of "issue preclusion" in affirming the district court order which foreclosed "the plaintiffs from showing that the defendants did, prior to July 26, 1965 [the date of judgment in *Deal I*], act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents." 525 F.2d at 349.

Nevertheless, this court held that plaintiffs' allegations of continuing wrongful actions by the defendants after July 26, 1965 declared a different cause of action than the one decided in *Deal* and that collateral estoppel does not apply to this cause. We recognized that in order to establish their claim of post-1965 constitutional violations the plaintiffs might need to rely on pre-1965 actions and policies of the Board. However, the extent to which the district court at the *Bronson* trial could properly take judicial notice of facts stipulated or proven in *Deal*, or receive new evidence of pre-*Deal* occurrences or conditions, is limited by the relevancy of such evidence to the inquiry in *Bronson*. That inquiry was identified as one designed to determine the existence or non-existence of unlawful segregation during the post-July 26, 1965 period. *Id.* at 350.

## II.

Nearly seven years ago this court affirmed the district court on the first interlocutory appeal, and set forth the criteria for consideration of evidence relating to the pre-1965 period. Yet there has been no trial of this case and the same issues are now before us on a second interlocutory appeal. This appeal was granted because the district court has failed to follow the directions of this court.

### A.

Following issuance of the mandate from this court, the plaintiffs filed an amended complaint in which they added new defendants. The district judge who had made the collateral estoppel decision retired, and the case was transferred on June 27, 1980 to a different judge. Thereafter this judge issued an "Entry Setting Forth This Court's Interpretation of Sixth Circuit Opinion in *Bronson v. Board of Education*." This document is published at 510 F.Supp. 1251 (S.D.Ohio 1980). In this "entry" the district judge correctly interpreted our *Bronson* decision as holding that the plaintiffs in this action are "collaterally estopped from relitigating claims that refer to the pre-*Deal* era." *Id.* at 1273. Nevertheless, at a hearing on October 17, 1980 the district court directed the defendants to respond to a memorandum filed by the plaintiffs on October 14th in which the plaintiffs argued that two intervening Supreme Court decisions, *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) (*Columbus*), and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Dayton II*), had approved a "new" theory of liability in school desegregation cases which was not apparent at the time of this court's *Bronson* decision.

The "new" theory, referred to by the plaintiffs as the "pre-Brown-dual-system theory," is that at the time of the historic decision of the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Cincinnati Board of Education was "operating a dual school system in Cincinnati, and that the

vestiges of that system had thereafter been expanded and aggravated rather than liquidated." Findings were made in *Columbus* and *Dayton II* that the defendants were operating dual systems at the time of the *Brown* decision. No such finding was made in *Deal*. From this the plaintiffs argued that the newly declared law required a finding in each *de facto* school desegregation case on the question of whether a dual or a unitary system was being operated in May 1954. Since no such finding had been made (or sought by the plaintiffs) in *Deal*, the *Bronson* plaintiffs argued that collateral estoppel could not be applied to prevent them from establishing that a dual system actually existed in Cincinnati at that time. In addition to arguing that collateral estoppel does not operate to prevent their establishing a fact not specifically found in *Deal* (the condition of Cincinnati schools on May 17, 1954), the plaintiffs contended that *Columbus* and *Dayton II* rendered collateral estoppel totally inapplicable to school desegregation cases.

### B.

The district court heard oral arguments on the issue on November 24, 1980 and took it under advisement. On February 11, 1982 the district judge issued a published opinion, 535 F.Supp. 846, and on April 5 certified the issue for interlocutory appeal. The district court rejected the claim that collateral estoppel is totally inapplicable to this case. However, the court went on to hold that although our *Bronson* decision still retains its vitality with respect to issues actually litigated in *Deal*, it "has been rendered obsolete to the extent that it forecloses any and all inquiries prior to July 26, 1965 on the ground that *Columbus* and *Dayton II*, by supplementing the body of school desegregation law existing in 1975, have established the propriety and necessity of considering issues that were not addressed in *Deal*." This "propriety and necessity" supposedly arose from the fact that *Deal* did not involve the legal effect of "remote" acts of the defendants and that the *Deal* courts—both the district court and the court of appeals—had limited their inquiry

to the question whether the defendants' actions between 1956 and 1965 were taken with segregative intent.

### III.

We agree with the district court that *Columbus* and *Dayton II* did not render the principles of collateral estoppel totally inapplicable to school desegregation cases. In *Bronson* we discussed the application of collateral estoppel to school desegregation cases in light of the strong public policy against school segregation and concluded that "issue preclusion" was the proper approach. 525 F.2d at 349. This court recently applied *Bronson* in another class action seeking desegregation of the Akron, Ohio school system. *See Bell v. Board of Education*, 683 F.2d 963 (6th Cir. 1982). The court there concluded that the issues decided in a 1968 class action brought by different plaintiffs were so similar to the issues in the case then before the court as to preclude reconsideration.

Since *Bronson* was decided the Supreme Court has, on several occasions, affirmed the central place of the principles of res judicata and collateral estoppel in civil litigation. *See Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–974, 59 L.Ed.2d 210 (1979); *Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 414–415, 66 L.Ed.2d 308 (1980); *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981); *Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 1889–90 n. 6, 72 L.Ed.2d 262 (1982). In *Allen v. McCurry* and *Kremer v. Chemical Construction Corp.* collateral estoppel was applied to preclude relitigation of civil rights claims. The consistent theme of these decisions is well summarized as follows in *Allen v. McCurry*, 449 U.S. at 94, 101 S.Ct. at 414:

The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that

were or could have been raised in that action. *Cromwell v. County of Sac*, 94 U.S. 351, 352 [24 L.Ed. 195]. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in a suit on a different cause of action involving a party to the first case. *Montana v. United States*, 440 U.S. 147, 153 [99 S.Ct. 970, 973, 59 L.Ed.2d 210]. As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. *Id.*, at 153–154 [99 S.Ct., at 973–974].

(Footnote omitted). Neither *Columbus* nor *Dayton II* concerned collateral estoppel, and we find nothing in either decision which raises doubt about the application of principles of collateral estoppel in this case.

In *Montana v. United States, supra,* the Court warned against "[u]nreflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues ...." 440 U.S. at 163, 99 S.Ct. at 978. We do not believe it is possible to read our treatment of the matter in *Bronson* as an "unreflective invocation of collateral estoppel." We clearly recognize the right to proceed on a claim of post-July 26, 1965 intentional segregation and directed that evidence of events and practices which occurred prior to that date are admissible if relevant to the post-1965 inquiry. All that was precluded was the claim that the defendants had operated a racially segregated public school system in Cincinnati in violation of the Constitution prior to July 26, 1965, an issue which had been decided in *Deal,* after full and fair litigation.

## IV.

■ We do not agree with the district court that our *Bronson* opinion "has been rendered obsolete to the extent it forecloses any and all inquiries prior to July 26, 1965,

on the ground that *Columbus* and *Dayton II* ... have established the propriety and necessity of considering issues that were not addressed in *Deal.*"

### A.

The district court erred in its basic assumption. While the Supreme Court approved a *method* of proving unlawful school segregation in *Columbus* and *Dayton II*, we find nothing in the opinion of the Court in either case which requires the use of this method. The Supreme Court did not identify a new theory of liability in these cases. Its affirmance of this court's judgment in each case was based on the determination that findings of intentional segregation in the school systems of Columbus and Dayton were not clearly erroneous.

The plaintiffs in *Columbus* and *Dayton II* were free to rely on any relevant evidence to prove the existence of unlawful segregation. They chose to introduce evidence of pre-1954 conditions in the two school systems from which inferences of intentional segregative acts could be drawn and then to show that these conditions had not been remedied as of the time of *Brown*. Once the courts made the desired inference and accepted the evidence of the continued existence of constitutionally impermissible conditions, the Columbus and Dayton boards of education were in the same legal position as those boards which enforced state laws mandating separation of the races. They were required to take the necessary steps to "convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board, supra,* 391 U.S. at 438, 88 S.Ct. at 1694 (citations omitted). Further, though *Brown v. Board of Education* is of preeminent importance in the development of constitutional law, the Supreme Court's approval of the use of the *Brown* decision date as a benchmark in *Columbus* and *Dayton II* did not mandate the same evidentiary approach to every *de facto* school case.[1]

1. The significance of May 17, 1954 is that from that time forward a plaintiff who could prove

that a public school system was intentionally

### B.

The district court also erred in its statement that the courts in *Deal* failed to consider the effect of "remote" evidence on the issue of segregative intent. An examination of the *Deal* record and briefs discloses that both plaintiffs and defendants introduced and relied upon pre-1954 evidence, particularly in their stipulation. Examples are Joint Exhibit 17, Tabulation, "Racial Composition of New School Centers Opened Between 1944–45 and 1964–65, Cincinnati Public Schools" and Joint Exhibit 53, Tabulation, "Memberships, Percent and Number of Negro Pupils, by School, Cincinnati Public Schools, 1950–51, 1960–61, 1963–64, and 1964–65." Other exhibits detailed public school building programs for the period 1944–1962 and various attendance zone boundary lines at stated times both before and after May 1954. The district court in its opinion in *Deal I* referred to the stipulation as follows:

> The stipulation, largely through its Joint Exhibits, further establishes *in great detail the historical background* culminating in this tabulation of [1964–65] school population.

244 F.Supp. at 580 (emphasis added). In its opinion in *Deal II* the district court expressly considered pre-1954 evidence. See Appendix, 419 F.2d at 1398–1399.

The contention that "remote" evidence was not considered in *Deal* appears to be based primarily on a single paragraph in this court's opinion in *Deal II* :

> It is not necessary for us to rule on the so-called "Voluntary Schools" which had been established at the request of Negroes but which no longer exist, or on other programs and practices which were discontinued prior to the filing of this lawsuit.

419 F.2d at 1395. When this paragraph is read in the context of the district court's

inquiry on remand, it is clear that the plaintiffs and the district court have given it an erroneous interpretation. In *Deal I* this court concluded that the district court had not made sufficient findings on two distinct allegations of the plaintiffs: (1) claimed discrimination in specific schools and programs and (2) claimed harm to black students, allegedly caused by racially imbalanced schools. Thus, the remand was for the purpose of making findings on these two issues and taking further proof if necessary. *Deal I*, 369 F.2d at 65.

On remand the district court followed the directions of this court precisely. In Findings 1–16 the district court outlined the distribution of black students throughout the system, determined that there was no inequality of educational facilities, and found that the Board's actions with respect to specific schools and programs were not racially motivated. In finding these facts the district court referred to and relied, *inter alia*, upon pre-1954 evidence. Findings 17 and 18 concerned pupil achievement and the inconclusive nature of the testimony of plaintiffs' expert witnesses on the "deleterious effects that may have been attributed to a racially imbalanced school . . . ." *See* Appendix to Opinion in *Deal II*, 419 F.2d at 1395–1401.

On appeal all of these findings were held to be supported by the evidence. 419 F.2d at 1393, 1395. The paragraph relied upon by plaintiffs and the district court is found at the very end of this court's opinion. It seems clear that it refers to the second prong of the remand inquiry—harm to black pupils. The quoted language merely states the obvious: Any harm to black students arising from programs and practices which were discontinued prior to the time of filing the lawsuit was not susceptible of being cured by a declaratory judgment or injunction. Therefore there was no necessi-

---

segregated became entitled to equitable relief. A plaintiff need not prove that unlawful segregation existed on May 17, 1954, however. If its existence is shown as of any date *thereafter*, the school system has the same affirmative duty to desegregate. In *Keyes v. School District No. 1, supra,* the seminal "northern" case

in the Supreme Court, unlawful segregation was proven as of 1969. In the Cleveland school case, *Reed v. Rhodes*, 607 F.2d 714, 716–17 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980), the benchmark date was 1964.

ty for the court to rule on whether or not they did result in harm. This statement did not refer in any way to the evidence considered by the district court or this court in deciding that the Cincinnati school system had not been intentionally segregated "up to July 26, 1965."

### C.

The plaintiffs in this case may not reopen the issue of whether the Cincinnati school system was unlawfully segregated prior to July 26, 1965. That issue was decided in *Deal.* In our first interlocutory decision in this case we noted that *Deal I* and *II* had settled the question of segregative intent by "finding that the Cincinnati Board had no such intent *up to July 26, 1965,* when the *Deal* inquiry ended." 525 F.2d at 347 (emphasis added). We then set forth our ruling on this question as follows:

> The district court's order forecloses the plaintiffs from showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents. These issues have been decided and under the issue preclusion application of collateral estoppel may not be reopened.

525 F.2d at 349. This finding of no segregative intent "prior to July 26, 1965," in a case where both pre-1954 and post-1954 evidence claimed to establish such intent was considered by the court, necessarily included a finding that no intentional segregation existed on May 17, 1954.

The court's decision in *Bronson* was not rendered obsolete by *Columbus* and *Dayton II.* It is still the controlling law of this case and must be applied by the district court in further proceedings herein.

The interlocutory order of the district court is reversed.