Mona BRONSON, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY
SCHOOL DISTRICT OF the CITY OF
CINCINNATI, et al., Defendants.

No. C–1–74–205.

United States District Court,
S.D. Ohio, W.D.

June 22, 1984.

See also, D.C., 550 F.Supp. 941.

Thomas I. Atkins, Reginald C. Govan, Office of General Counsel, NAACP Special Contribution Fund, Brooklyn Heights, N.Y., Thomas I. Atkins, Reginald C. Govan, NAACP Litigation Office, Cincinnati, Ohio, William Taylor, Center for Nat. Policy Review, Washington, D.C., Trudy D. Rauh, Cincinnati, Ohio, for Bronson plaintiff.

Robert W. Blackmore, Cincinnati, Ohio, for plaintiff Beaty.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for defendant Lockland City School Dist.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for defendant Princeton City School Dist.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for defendants Finneytown Local School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., Hamilton County School Dist.

John C. Elam, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant Wyoming City School Dist.

James W. Harper, Asst. Pros. Atty., Cincinnati, Ohio, for defendant Oak Hills Local City School Dist.

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for defendant Green-Hills Forest Park City School Dist.

William E. Santen, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for defendant Sycamore City School Dist.

John A. Lloyd, Jr., Sally Conley Lux, Glen Weissenberger, Cincinnati, Ohio, for defendant City of Cincinnati School Dist.

G. David Schiering, A. David Nichols, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State of Ohio, Special Counsel to Attorney General, State of Ohio; Represents State Bd. of Educ.

James W. Farrell, Jr., Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist., Reading Community City School Dist.

Bruce I. Petrie, Sr., John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendant Indian Hill Exempted Village School Dist.

## DECISION AND ENTRY FINDING THAT THE PROPOSED SETTLEMENT AGREEMENT OF THIS LAWSUIT IS FAIR, REASONABLE AND ADEQUATE; ORDER ADOPTING PROPOSED SETTLEMENT AGREEMENT AS A CONSENT DECREE AND ORDERING CINCINNATI DEFENDANTS AND STATE DEFENDANTS DISMISSED WITH PREJUDICE

RICE, District Judge.

This lawsuit was initiated on May 29, 1974, when the Plaintiffs, a group of Cincinnati schoolchildren and their parents, filed their Complaint. The Plaintiffs alleged that the Board of Education of the City School District of the City of Cincinnati ("Board"), its members and the Superintendent of the Cincinnati Public Schools ("Cincinnati Defendants"), together with the Ohio State Board of Education and Superintendent of Public Instruction for the State of Ohio ("State Defendants"), established and maintained the Cincinnati Public Schools as a racially segregated school system (doc. # 1).[1] Plaintiffs alleged that this violated the Fourteenth Amendment to the United States Constitution.

After this cause was filed, the parties undertook exhaustive discovery. Thousands of documents were exchanged. Numerous depositions were taken. Judge Porter ordered the case certified as a class action, *see* docs. # 266 and 267, defining the class as, "all students presently attending or who will in the future attend schools in the public school system of the City of Cincinnati and the parents of such children." *Id.*

During this period from the filing of this lawsuit through mid-1982, the parties litigated the question of the preclusive effect of *Deal v. Cincinnati Board of Education,* 244 F.Supp. 572 (S.D.Ohio 1965), *aff'd,* 369 F.2d 55 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), *aff'd on other issues,* 419 F.2d 1387 (6th Cir.1969), *cert. denied,* 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). *See Bronson v. Board of Education of the City School District of the City of Cincinnati ("Bronson I"),* 525 F.2d 344 (6th Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed. 175 (1976); *Bronson v. Board of Education of the City School District of the City of Cincinnati ("Bronson II"),* 687 F.2d 836 (6th Cir.1982).

Ultimately, in December, 1982, the Court set a trial date of January 10, 1984 for the liability phase of this case. *See* doc. # 559. On December 19, 1983, this Court appointed the Hon. David S. Porter, Senior District Judge for the Southern District of Ohio, and Mr. Warner Petterson of the Community Relations Division of the United States Department of Justice, to direct settlement

---

**1.** More than two years after filing their Complaint, Plaintiffs, with leave of Court, filed an Amended Complaint. *See* doc. # 83. In their Amended Complaint, Plaintiffs joined numerous suburban Cincinnati school districts as defendants. Through their Amended Complaint, Plaintiffs sought inter-district relief. Ultimately, the court granted the suburban Defendants' motions for summary judgment and ordered same dismissed from this action. *See* docs. # 681–87, # 704 and # 705. Consequently, this case was scheduled to go to trial against only those originally charged in the Complaint—the Cincinnati Defendants and the State Defendants.

efforts. From December 19, 1983 until the eve of trial, Judge Porter and Mr. Petterson, with great dedication and diligence, directed the parties in settlement discussions. On January 12, 1984, the day the liability phase of the trial was to commence,[2] the Court postponed the trial until January 17, 1984 and ordered the parties to continue negotiations. On January 16, 1984, the negotiations broke down, and Judge Porter and Mr. Petterson discharged the negotiators.[3] Nonetheless, on January 17, 1984, the Court once again postponed the trial[4] and ordered the parties to resume negotiations. The parties bargained intensively, often times until after midnight and throughout the weekends. This process came to fruition on February 16, 1984, when the parties reached the proposed settlement agreement which is the subject of the present proceeding.[5]

 No class action can be dismissed or compromised without prior court approval. Rule 23(e), Fed.R.Civ.P.[6] Before a court can approve a proposed settlement, it must give the class members notice of the proposed settlement and an opportunity to comment upon it. *Id.* The procedure for approving a settlement is a three-step process. The court must preliminarily approve the proposed settlement; then, members of the class must be given notice of the proposed settlement and after a hearing, the Court must decide whether the proposed settlement is fair, reasonable and adequate. *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983); *Stotts v. Memphis Fire Department* ("*Stotts*"), 679 F.2d 541 (6th

Cir.1982), *reversed on other grounds, sub nom. Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

In *Williams v. Vukovich, supra,* the Court elaborated on the standards, in this Circuit, governing preliminary court approval of a proposed settlement.

Initially, a proposed decree should be preliminarily approved. The court should determine whether the compromise embodied within the decree is illegal or tainted with collusion. *See Stotts,* 679 F.2d at 551; *United States v. City of Miami,* 614 F.2d 1322, 1230–31 (5th Cir. 1980), *on reh'g,* 644 F.2d 435 (5th Cir. 1981); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). The court's determination should be based on its familiarity with the issues, the results of discovery, and the character of the negotiations prior to the entry of the decree. Preliminary approval is critical for a decree which is the product of arms-length negotiations. With such approval a decree is presumptively reasonable. *See Stotts,* 679 F.2d at 551; *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir. 1980); *United States v. City of Miami,* 614 F.2d at 1333. An individual who objects, consequently, has a heavy burden of demonstrating that the decree is unreasonable. *See Stotts,* 679 F.2d at

---

2. Court was convened on January 10, 1984. However, shortly after being convened, Court was recessed in order that the Court and counsel could go on a "view" of the Cincinnati Public School System.

3. The negotiators were Mr. William L. Taylor and Dr. Marvin B. Scott for the Plaintiffs, Mr. G. David Schiering, Dr. James N. Jacobs and Mr. Lynn E. Goodwin for the Cincinnati Defendants and Mr. Mark O'Neill and Mr. A. David Nichols for the State Defendants. Reaching a settlement in this lawsuit would not have been possible without the selfless and tireless efforts of these gentlemen.

4. This was the second of what would eventually be at least a half dozen postponements of the trial.

5. The State Defendants approved the proposed settlement agreement on February 19, 1984. The Cincinnati Defendants approved it on February 20, 1984.

6. Rule 23(e) provides:
 Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

551; *Village of Arlington Heights,* 616 F.2d at 1014.

720 F.2d at 921.

By Decision and Order of March 15, 1984 (doc. # 713), this Court preliminarily approved the proposed settlement agreement. This Court based its preliminary approval on its familiarity with the issues presented in this case, the discovery conducted and the character of the negotiations. This Court concluded that the proposed settlement agreement was neither illegal nor tainted with collusion and that it was the product of arms-length negotiations.

Having given preliminary approval to the proposed settlement agreement, the Court was next required to give notice to the members of the class both of the proposed settlement and that a hearing, scheduled April 6, 1984, would be held to determine whether the settlement was fair, adequate and reasonable. *Williams v. Vukovich, supra; Stotts, supra.* Accordingly, contemporaneous with giving its preliminary approval to the proposed settlement agreement, the Court approved the form of the notice proposed by the parties.[7] *See* doc. # 713, at ¶ 2. The Court ordered that between March 16, 1984, and March 22, 1984, the approved form of the notice and the entire text of the settlement agreement be published once each in *The Cincinnati Enquirer, The Cincinnati Post, The Call and Post* (Cincinnati edition) and *The Cincinnati Herald. Id.* at ¶ 3. The notice and proposed settlement agreement was published as directed. Transcript of April 6, 1984 Hearing ("Tr.") at 24. Plaintiffs' Ex. ## 1, 2 and 3.

In addition to the Court ordered notice by publication, the members of the class and other interested persons received notice in a variety of other ways. First, since this case is of great public interest, it was covered extensively by the Cincinnati media. On February 16, 1984, the parties announced that they had reached a tentative agreement, by holding a press confer-

ence which was televised and the subject of extensive reporting in the print media.

After the proposed settlement agreement was reached and before the fairness hearing was held, the parties took steps to inform members of the community of the contents of the proposed agreement and that the fairness hearing would be held. Plaintiffs' attorney, Reginald C. Govan, and the President of the local chapter of the NAACP, the Rev. Melvin C. Jones, sent letters which explained the proposed settlement agreement, together with copies of it, to numerous interested persons, churches, neighborhood groups and civic organizations. Tr. at 24; Plaintiffs' Ex. # 6. Representatives of the Plaintiffs and of the Cincinnati Defendants spoke at numerous public meetings throughout the District for the purpose of explaining the proposed settlement agreement, answering questions about it and notifying interested persons of the fairness hearing. Tr. at 24, 53–54; Defendants' Ex. # C–2001. Finally, all students in the Cincinnati school system were given a "flyer" to take home. The flyer notified students and their parents or guardians of the proposed settlement agreement, that copies of it were available for inspection at each school in the district, during normal school hours, and that the fairness hearing would be held on April 6, 1984.

Based on the foregoing, the Court concludes that the notice of the proposed settlement agreement and the scheduled fairness hearing, given to members of the class, was the "best notice practical under the circumstances." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The notice was sufficient to allow members of the class, "a full and fair opportunity to consider the proposed decree and develop a response." *Williams v. Vukovich, supra,* 720 F.2d at 921. *See Mendoza v. United States,* 623 F.2d 1338, 1351 (9th Cir.1980).

---

7. The notice that the Court approved and ordered published is attached, as Exhibit A, to the parties joint motion for preliminary approval of the proposed settlement agreement (doc. # 711–A).

The final step in the Court's process of deciding whether to approve the proposed settlement agreement and to adopt it as a consent decree requires the Court to address the key question before it, to wit: is the proposed settlement agreement a fair, reasonable and adequate resolution of the Plaintiff's allegations? On April 6, 1984, the Court held a hearing in order that the parties, members of the class and representatives of the Cincinnati community could comment on the proposed settlement agreement. Based upon the testimony adduced at that hearing, the Court's familiarity with this litigation and the parties' post-hearing submissions, the Court now renders its opinion on the fairness, reasonableness and adequacy of the proposed settlement agreement.

■ At the outset, since this agreement was reached between the parties as the result of arms-length negotiation and is most definitely *not* a court imposed settlement, this Court has the power to do only the following with regard to the settlement:

1. to approve the agreement as negotiated and agreed to by the parties, without changes;

2. to reject the agreement and, in effect, to send the parties back to the negotiating table, without suggestions or recommendations by the Court; or

3. to reject the agreement, as negotiated and approved, but with suggestions and recommended changes to the parties.

This Court does *not* have the power to order specific changes or modifications to be made in the agreement. Only the parties, during arms-length negotiations, such as those that proceeded the drafting and the approval of this agreement, have the power to agree upon changes. The Court's power, should it not approve the agreement as written, is therefore limited to either rejecting the agreement, without comment, or, in the alternative, to rejecting the agreement with suggestions and recommendations.

■ In assessing the adequacy, fairness and reasonableness of a settlement agreement, the Court must consider certain factors and is guided by certain principles.[8] First, the Court must weigh the Plaintiffs' "likelihood of success on the merits against the amount and form of relief offered in the settlement." *Carson v. American Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). *See also, Williams v. Vukovich, supra,* 720 F.2d at 922; *Stotts, supra,* 679 F.2d at 552; *United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977); *Grunin v. International House of Pancakes,* 513 F.2d 114, 124 (8th Cir.1975). The Court must also consider the complexity, expense and likely duration of the litigation, and the stage of the proceedings and the amount of discovery completed. *Stotts, supra,* 679 F.2d at 552.

■ Additionally, when significant discovery has been completed, the Court should defer to the judgment of experienced trial counsel who has evaluated the strength of his case. *Williams v. Vukovich, supra,* 720 F.2d at 922–23. *See also, Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Finally, the Court must consider carefully any objections raised by class members. *Williams v. Vukovich, supra,* 720 F.2d at 923; *Stotts, supra,* 679 F.2d at 552. However, a court should not withhold approval merely because some class members object to it. *Flinn v. FMC Corp., supra; Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). The Court must also consider whether the agreement is the product of arms-length rather than collusive bargaining. *Liddell, supra,* 567 F.Supp. at 1042. In reviewing a

**8.** *See generally, Liddell v. Board of Education,* 567 F.Supp. 1037 (D.Mo.1983); Manual for Complex Litigation, § 1.46 at 56 (5th ed. 1982); 3 B. Moore, *Federal Practice,* ¶ 23.80[4] at p. 23–520 to 23–525; *Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1569–76 (1976).

proposed settlement agreement, the Court does not resolve the factual and legal issues that are the basis of the underlying lawsuit. *Id.* at 921. Likewise, a "court may not withhold approval simply because the benefits accrued from the [agreement] are not what a successful plaintiff would have received in a fully litigated case." *Williams v. Vukovich, supra,* 720 F.2d at 922. Finally, the Court must determine whether the proposed settlement is consistent with the public interest. *Id.* at 923.

■■■ With these standards in mind, this Court turns to the proposed settlement agreement herein.

1. Plaintiffs' likelihood of success on the merits balanced against the relief offered by the proposed settlement agreement.

Several impediments obstruct Plaintiffs on their journey to ultimate success in this action. Foremost of these obstacles is the Sixth Circuit decisions in *Bronson I* and *Bronson II.* In *Bronson I* and *Bronson II,* the Sixth Circuit held that *Deal*[9] precluded the Plaintiffs, herein, from "showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents." *Bronson I, supra,* 525 F.2d at 349. Previously, this Court discussed the preclusive effect of the *Deal* and *Bronson* decisions:

> Based upon the analysis of the *Deal* and *Bronson* decisions set forth above, the Court concludes that:
>
> 1. Plaintiffs are *precluded* from attempting to prove that prior to July 26, 1965, the *Cincinnati Defendants* acted with segregative intent with respect to the Cincinnati School District.
> 2. Plaintiffs are also *precluded* from attempting to prove that as of 1954, the date of the rendering of the decision in *Brown v. Board of Education,*

347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954), a dual school system existed in Cincinnati because of the prior segregative acts of the *Cincinnati Defendants* which triggered the *Cincinnati Defendants'* responsibility after 1954 to act affirmatively to eliminate the continuing consequences of their prior acts.

> In other words, Plaintiffs cannot attempt to prove that the Cincinnati Defendants acted with segregative intent prior to July 26, 1965 (the date of the *Deal* decision) *or* that they failed to take affirmative steps to eliminate a dual system in Cincinnati prior to July 26, 1965.
> 3. Plaintiffs are also *precluded* from attempting to prove that the *Cincinnati Defendants* conspired with the State and/or any or all of the Suburban Defendants to create, maintain and/or perpetuate a *de jure* segregative school system in Cincinnati prior to July 26, 1965.

> The above limitations on Plaintiffs' causes of action are compelled by the finding in *Deal,* and the collateral estoppel effect of the *Deal* decision as has been interpreted by the Sixth Circuit in *Bronson I* and *II,* to wit: that the Cincinnati Defendants had not acted with segregative intent with respect to the Cincinnati school system prior to July 26, 1965.

*Bronson v. Board of Education of the City School District of Cincinnati,* 573 F.Supp. 767, 773–74 (S.D.Ohio 1983).

The difficulties that the *Bronson* and *Deal* decisions imposed upon Plaintiffs' case cannot be minimized. Many of the events upon which Plaintiffs would have relied to prove their case occurred prior to July 26, 1965. *See Transcript* at p. 11–22. Clearly, the probative value of these events, to prove that a post-July 26, 1965 violation had occurred, is attenuated at best.[10]

---

9. *Deal v. Cincinnati Board of Education,* 244 F.Supp. 572 (S.D.Ohio 1965), *aff'd,* 369 F.2d 55 (6th Cir.1966) *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

10. The Court deems it unnecessary in the present context to address, once again, the question of the permissible uses of "pre-*Deal* evi-

The *Bronson* and *Deal* decisions were not Plaintiffs' only roadblock. The Plaintiffs were also limited in the presentation of their case by *Bell v. Board of Education*, 683 F.2d 963 (6th Cir.1982). This Court recognized the limiting effect of *Bell* in *Bronson v. Board of Education, supra:*

> In *Bell,* the Sixth Circuit unequivocally determined that school officials "otherwise innocent of segregative intent," could not be required to bear the burden and expense of integrating a school system whose segregated racial distribution was the result of other agencies, such as housing authorities, having acted independently with segregative intent in shaping the racial mix of the community. *Bell v. Board of Education,* 683 F.2d, *supra,* at 968.

573 F.Supp. at 773. Based upon that analysis of the *Bell* decision, this Court concluded that in the absence of proof that the Cincinnati Defendants and/or State Defendants had acted with segregative intent:

> Plaintiffs are *precluded* from attempting to prove that *other parties and/or agencies* not before the Court acted with segregative intent individually and/or independently from the named Defendants in creating a *de jure* segregated community and/or school system in Cincinnati and/or any or all of Hamilton County.

*Id.* at 774.

Based on the foregoing, the Court concludes that had this case gone to trial, Plaintiffs would have faced significant risks which may have prevented their ultimately prevailing. Against this conclusion, the Court must balance the form of relief that the proposed settlement agreement will afford the Plaintiff class. This requires the Court to examine the agreement.[11]

The heart of the agreement is that the district will, over the next seven years, continue to reduce racial isolation by the use of new and expanded alternative schools supported by a commitment of $35 million in state funds, over and above Cincinnati's normal state aid. Open enrollment will continue to be available as a means of reducing racial isolation, and a strong program of remedial education will be instituted in low achieving schools. There is cause to believe that the wide variety of voluntary choices available under the settlement will make it unnecessary for any child to ride a bus except by choice. Instead of dictating the methods to be used in reducing racial isolation, the Agreement establishes certain standards to be reached over the seven-year term and leaves with the school district the authority to select the methods of meeting that responsibility. The Agreement acknowledges that the school district should have maximum flexibility in determining those methods and that no school-by-school standard should be applied.

The Agreement sets a district-wide standard under the Taeuber Index of Dissimilarity to be achieved by the seventh year, with the school district committed to use its best efforts to achieve annual progress and to show, by December, 1987, that there is a reasonable probability of achieving the ultimate standard by June 30, 1991.

The Taeuber Index measures the extent to which each school reflects the racial composition of the district as a whole. It combines the results of that measurement, and computes a single number between 0 and 100. A reduction in racial isolation causes a reduction in the number (on the Taeuber Index, 100 reflects complete racial isolation and zero shows that each school mirrors the racial composition of the district as a whole). In the 1973–74 school year, the district-wide Taeuber Index was 76 and by the 1983–84 school year it was approximately 53—a reduction of 23 points in 10 years for an annual average reduction of 2.3 points. Under the Settlement Agreement, the 1983–84 school year index of

---

dence." It is sufficient to point out that probative value of such evidence is somewhat limited.

**11.** The following discussion of the various provisions of the settlement agreement is taken from the parties' Joint Statement and Summary of Agreement released on February 16, 1984.

approximately 53 is to be reduced to approximately 36 by the 1990–91 school year—a reduction of 17 points in seven years for an annual average reduction of 2.4 points.

The backbone of the Agreement is the establishment of new and expanded alternative programs that will offer sound educational options for students. The alternative school enrollment currently is approximately 14,000 students. By the end of the seventh year, it is expected that enrollment will be approximately 20,000—an increase of about 6,000 students. To the extent consistent with sound educational planning, those new alternatives will be located at schools reflecting a high degree of racial isolation. Alternative programs will qualify for the new state aid only if they are projected to reduce, and after a year do in fact reduce, racial isolation. Additionally, the current open enrollment program will remain in place as will the district's policy on staff racial balance.[12]

The Taeuber Index levels called for in the proposed settlement agreement compare favorable with those in other school systems. Admittedly, the Taeuber Index levels for the Cincinnati school system will remain higher than they are in some school systems where, after findings of liability, court ordered desegregation plans are in place. Tr. at p. 28. However, the levels will be equal to or below those for many urban school systems, including some that are under court ordered plans. *Id.*

If the Taeuber Index levels do not go below the levels called for in the proposed settlement agreement, some school-children, both black and white, will remain in racially isolated schools. Nonetheless, the great majority of Cincinnati school-children will attend schools that are not racially isolated. *Id.* at 29.

Also, the agreement contains a provision directed at improving achievement in schools with low achievement records. Special strategies for improvement in achievement are to be directed to students in schools with low achievement records. In addition to other strategies being developed by the Superintendent, seven schools will receive special additional attention directed to improving basic skills. Approximately $5 million will be directed to this effort over the seven year term of the agreement.

The agreement calls for additional "ancillary" forms of relief. A review of discipline policy will be conducted annually beginning in 1985. A district-wide *ad hoc* discipline committee, which will include a representative of the NAACP, will review the policy annually. The results of its review will be conveyed to the Superintendent by June 30 of each year. Efforts also will be made to assure that tests are not culturally biased and to guard against racial isolation within school buildings. In many cases where there has been a court imposed remedy after a finding of liability, courts have recognized the importance of these types of ancillary relief. *See e.g., Bradley v. Milliken,* 402 F.Supp. 1096 (E.D.Mich.1975), *aff'd,* 540 F.2d 229 (6th Cir.1976), *aff'd,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Evans v. Buchanan,* 447 F.Supp. 982 (D.Del.), *aff'd,* 582 F.2d 750 (3d Cir.1978), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *United States v. Board of School Commissioners of the City of Indianapolis,* 506 F.Supp. 657 (D.Ind.1979), *aff'd in part, vacated in part,* 637 F.2d 1101 (7th Cir.) *cert. denied,* 449 U.S. 839, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980).

A Facilitator will be selected jointly by Plaintiffs and the school district. The Facilitator will collect and analyze information on performance under the Agreement, act as a clearing-house for information, serve as a resource for a community-wide task force and file timely reports with the Court on progress under the Agreement. The task force, which will consist of seven persons selected by Plaintiffs and seven

---

**12.** Specifically, the proposed settlement agreement requires a reduction in the Taeuber Index to 36.5 for elementary schools, to 36 for middle and junior high schools and to 34 for senior high schools.

persons selected by the school district, will have the objective of mobilizing and securing the widest possible support throughout the community for fair and effective performance of the Agreement.

The agreement does not provide for the creation of any mechanism to resolve disputes arising under the agreement. A hearing will be held in nine months to determine whether disputes are being adequately resolved. If not, the Court has the option of creating such a mechanism.

Based upon the foregoing review, the Court concludes that the proposed settlement agreement will afford substantial relief to the Plaintiff class. While not eradicating all racial isolation, the agreement will require a meaningful reduction of racial isolation in the Cincinnati school system. When the Court balances the substantial relief that the proposed settlement agreement provides against the Plaintiffs' likelihood of success on the merits, the inescapable conclusion is that the proposed settlement agreement is fair, reasonable and adequate.

2. The complexity, expense and likely duration of the litigation.

At this point, this case has been pending for over ten years. It has been to the Sixth Circuit on appeal twice even though there has not yet been a trial. If this case did go to trial, the trial would be long, expensive and complex.[13] That portion of the trial scheduled to have begun in January, (the liability phase) would have exceeded four months. Assuming that the Court made a finding of liability, a remedy hearing would have been necessary. These hearings would have been followed by appeals. Thus, if this case had gone to trial and if the Plaintiffs had prevailed, there would have been additional delay before the Plaintiffs would begin to reap the benefits of a remedy. Adoption of the settlement agreement will speed the process of ending racial isolation in the Cincinnati schools. Consequently, the prospective length, expense and complexity of a trial in this case induce this Court to conclude that the proposed settlement agreement is fair, reasonable and adequate.

3. The stage of the proceedings and amount of discovery completed.

As previously stated, this case has passed its tenth anniversary. Extensive discovery has been completed. There are more than 700 docket entries in this case. Serious settlement negotiations did not commence until the eve of trial. Indeed, the negotiations required the trial to be postponed, repeatedly. Thus, this factor counsels toward the conclusion that the proposed settlement agreement is fair, reasonable and adequate. This was not a hurried agreement reached in the initial stages of a lawsuit. Rather, because of the stage of the proceedings and the amount of discovery completed, competent, experienced counsel for Plaintiffs were able to enter into this agreement with full knowledge of the strengths and weaknesses of their case.

4. Opinion of counsel.

In this case, counsel for all parties testified that the proposed settlement agreement is fair, reasonable and adequate. They also recommend that this Court adopt the proposed settlement agreement as a consent decree. Because of two factors present herein, the Court places particular reliance on the opinion of counsel.

First, as outlined above, this case was "mature." There had been extensive discovery. Hence, counsel were able to fully evaluate the benefits afforded to the Plaintiffs by the proposed settlement in light of a complete understanding of the strengths and weaknesses of the Plaintiffs' case. Second, Plaintiffs' counsel is extraordinarily experienced. Tr. at p. 196–202; 207. Lead counsel for Plaintiffs, Mr. Thomas I. Atkins, has more experience litigating school desegregation cases than anyone now active in the field. Mr. Atkins has litigated school desegregation cases in 14 states, from coast to coast. The Plaintiffs' lead negotiator, Mr. William Taylor, is also

13. However, the issues are not so complex as to prevent Plaintiffs' experienced trial counsel from fully evaluating the merits of their case and the proposed settlement.

experienced in school desegregation cases. Mr. Taylor has been involved in school desegregation cases since 1954. In addition to Plaintiffs' counsel, lead counsel for the State Defendants, Mr. Mark O. O'Neill, has experience in litigating school desegregation suits. He represented the state of Ohio in the Cleveland and Columbus cases.

Based on the exhaustive pretrial proceedings in this case and the experience of counsel, this Court pays particular attention to the opinion of counsel that the proposed settlement agreement is fair, adequate and reasonable.

5. The presence of collusion in reaching the proposed settlement agreement.

The proposed settlement agreement is not the product of collusion. There was no hint of collusion during the negotiating process. At the fairness hearing no such allegation was made. On the contrary, the proposed settlement was the result of intense, arms-length negotiations between the parties. Thus, because no hint of collusion is present, this factor is no barrier to this Court ultimately concluding that the proposed settlement agreement is fair, adequate and reasonable.

6. The concerns and comments of the class members.

In assessing the fairness and reasonableness of a proposed settlement agreement, a court must consider objections to it. *Stotts, supra,* 679 F.2d at 554. In *Liddell v. Board of Education of City of St. Louis,* 567 F.Supp. 1037 (E.D.Mo.1983), Judge Hungate summarized certain overriding considerations by which objections to a proposed settlement agreement, and the impact of same upon the Court's ultimate resolution of the question of whether the proposed settlement agreement is fair, adequate and reasonable, must be evaluated.

In considering the extent of opposition, the Court must view the agreement in its entirety, rather than isolating 'individual components of the agreement for analysis. *Armstrong [v. Board of School Directors,* 616 F.2d 305, 315 (7th Cir.1980) ].

The settlement, moreover, is a product of compromise efforts by adversaries. Usually neither side will attain all its goals in such a settlement. The Court must respect the terms derived from the parties' negotiations as long as the agreement does not violate constitutional standards and is found adequate, reasonable, and fair. *See Armstrong v. Board of School Directors,* 471 F.Supp. 800, 805, 812–13 (E.D.Wis.1979), *aff'd,* 616 F.2d 305 (7th Cir.1980).

567 F.Supp. at 1037. *Accord, Stotts, supra,* 679 F.2d at 554.

In the present case, this Court received written comments on the proposed settlement agreement from 57 class members, not only individuals but also religious, civil and community groups and leaders. Of these, 47 (a great majority) were in favor of the agreement. Additionally, 46 individuals or spokespersons for various civic, community and religious groups chose to make oral presentations at the fairness hearing.

Initially, the Court wishes to commend all those who presented comments on the fairness, reasonableness and adequacy of the proposed settlement agreement. The sincerity and interest shown by the many speakers at the fairness hearing was indeed impressive. This Court has considered all of the comments, whether submitted only in writing or whether submitted both in writing and expressed orally at the fairness hearing. The comments expressed, considered in their totality, are a further basis for this Court's finding that the proposed settlement agreement is fair, reasonable and adequate. Rather than merely state this determination in conclusory language, the Court will address many of the concerns raised by those opposed to the proposed settlement agreement and by those commentators who, although in favor of the agreement, were troubled by certain of its provisions.[14]

---

**14.** The Court will not specifically address the favorable comments. Likewise, certain comments that were not relevant to the question at issue will not be addressed.

One major area of concern for one opponent, the Cincinnati Federation of Teachers ("CFT"),[15] as well as for some of its supporters, is the flexibility in the method of reducing the Taeuber Index that the proposed settlement agreement affords the Cincinnati Defendants and the absence from the agreement of a school-by-school standard. The CFT suggested that the Court order the agreement redrafted to require the annual adoption of a comprehensive, school-by-school desegregation plan. Further, the CFT would require the plan to be submitted to the Community-wide Task Force and the CFT for annual review.

Of central importance to the Plaintiffs is a given result, to wit: the reduction of racial isolation in the Cincinnati school system. The result is crucial, not the method of reaching that result. For the Cincinnati Defendants, maximum flexibility in the methods to be used in achieving the result was the central concern expressed in the negotiating process. Indeed, such a provision is so important to the Cincinnati Defendants that following the CFT's suggestion would quite simply result in the termination of any effort to settle this lawsuit. The absence of a comprehensive plan for the method of reaching the goals of the agreement does not render it unfair, unreasonable or inadequate. Additionally, the Court notes that the adoption of a plan such as that envisioned by the CFT normally follows not an arms-length settlement, but rather a trial, a finding of liability, and a court ordered remedy.

One commentator, the Avondale Community Council, stated, in both its written submission and in its oral presentation, that it could neither support nor oppose the proposed settlement agreement. The Avondale Community Council opined that there had not been sufficient time for citizens to fully understand the proposed agreement.

This is an essential question. Members of the class were entitled to notice which gives them a full and fair opportunity to consider the proposed settlement agreement and to develop a response to it. *Williams v. Vukovich, supra,* 720 F.2d at 921. However, as the Court has concluded above, the notice afforded class members such an opportunity.

There was much comment at the fairness hearing concerning the adequacy of the proposed agreement's major goal, the reduction of racial isolation as measured by the Taeuber Index levels. Generally, the commentators supported the use of the Taeuber Index as a measure of the reduction in the levels of racial isolation in the Cincinnati schools. *See e.g.,* Tr. at 77. Some supporters of the agreement questioned whether the Taeuber Index levels were set low enough to eliminate racial isolation in the elementary schools. Tr. at 77–78; 87–88; 95. The Court has considered these concerns and is of the opinion that the Taeuber Index is an acceptable method of measuring the reduction of racial isolation. Further, the Court does not agree with those who challenge levels at which the Taeuber Index is set. The proposed settlement agreement requires the reduction of the Taeuber Index to levels that are above those in some school systems operating under court imposed desegregation plans. However, the levels that must be attained are equal to or lower than those for many urban centers, including some operating under court imposed plans. Keeping in mind that this is a negotiated settlement and not a court imposed remedy, the Court concludes that the Taeuber Index levels provided for in the agreement are fair, reasonable and adequate.

---

**15.** The CFT filed a post-hearing brief (doc. # 716) in which they continue to argue that the proposed settlement agreement is not fair, adequate and reasonable. The Cincinnati Defendants have filed a motion to strike that brief (doc. # 719), arguing that the CFT does not have standing.

This Court does not dispute the Cincinnati Defendants' assertion that the CFT does not have standing. Nonetheless, the Court overrules the motion in the interest of assuring that it will consider all possible objections to the proposed settlement agreement.

There was a significant amount of comment about the provisions related to the establishment of new and expanded alternative schools and programs. This commentary ranged from enthusiastic support for the use of alternative schools to reduce racial isolation to outright opposition. This opposition was varied. For example, the Friends of the School for Creative and Performing Arts objected to the expansion of that school to include kindergarten through third grade. Tr. at 166–70. Other opponents worried about the impact of expanded alternative schools on neighborhood schools, including those which are racially balanced. Tr. at 80, 95, 143, 172–73. The CFT recommended that the proposed agreement be modified so that the Cincinnati Defendants are obligated to use all standard techniques to reach required levels of desegregation.[16] Tr. at 151–52. Still others expressed their concerns about whether the Alternative Schools Committee would be truly representative of the community. Tr. at 83, 131, 143, 162.

The Court has considered, individually and collectively, all of these thoughtful comments about the prospect of new and expanded alternative programs. However, none of the comments convinces the Court that the proposed settlement agreement is unfair, unreasonable or inadequate. Initially, it should be noted that the provision for the expansion of alternative schools does not alter the Taeuber Index levels that the Cincinnati Defendants are contractually required to meet. The methods by which these levels are to be reached are left to the Cincinnati Defendants. However, the proposed agreement does put some limits on the placement, maintenance and funding of new alternative programs. For instance, alternatives that are in existence for one full school year and remain 90% or more of one race, are not eligible for continued state funding unless they are redesigned in a way that will reduce racial isolation. Additionally, to the extent consistent with sound educational planning, the new alternatives are to be located in schools in which 80% or more of the students are of one race.

The community is not without input into the alternatives' process. At least one member of the Alternative Schools Committee may be designated by the NAACP. Two members of the Community-wide Task Force may be members of the Alternative Schools Committee.[17] In addition to input from the community, the proposed agreement obligates the Cincinnati Defendants to inform all students of the availability of alternatives and to establish a recruitment and counseling center to assist in this process.

There was some comment directed at the Board's obligation, undertaken in the proposed agreement, to maintain and enforce its policy on staff racial balance. Some commentary stressed the need for in-service training of staff. Tr. at 80–81, 143, 162; Written statement of Drs. Patricia O'Reilly and Jeannette Taylor. Also, the CFT recommended that the agreement be rejected unless modified to require unbiased assignment of administrators as well as teachers. Tr. at 153.

Neither of these comments cause this Court to conclude that the proposed agreement is unfair, unreasonable or inadequate. Although the agreement does not require the expenditure of funds on in-service training, the Court notes that the Cincinnati Defendants anticipate expending funds in that area. See Exhibit E to the settlement agreement. Also, when the agreement is viewed in its entirety, the absence of any provision regarding the racial balance of school administration does not cause it to become unfair, unreasonable or inadequate.

16. Others spoke in favor of the establishment of one or another specific alternative school. See Tr. at 80, 134–36; written statement of Elizabeth Newcomer and Shirley Green.

17. The CFT also wanted the agreement amended to prohibit the involuntary reassignment of teachers in the expansion of the alternative schools and programs. Tr. at 154–55. In this Court's opinion, this is a subject for bargaining between the CFT and the Cincinnati school system rather than a question to be addressed in the settlement of this lawsuit.

A number of persons commented on the potential problem of racial isolation within school buildings. They expressed their concern that alternatives' programs would be placed in designated sections of otherwise racially isolated, neighborhood schools. As a consequence, students who attend the school as a neighborhood school would not significantly commingle with those who attend it as an alternative. One commentator termed this the specter of "fictional integration." Tr. at 83.

In Section 7 of the proposed settlement agreement, the parties recognize the importance of guarding against racial isolation within school buildings. Section 7 recites that the Cincinnati Defendants have in effect policies to assure the unbiased placement of students within school buildings. The agreement obligates the Cincinnati Defendants to continue to implement those policies and to review them periodically to assure their effectiveness.

The Court received significant comments on the provisions in the agreement designed to assure its effective performance. Primarily, the commentators directed their remarks at Sections 11A and 11B which provide for the appointment of a Facilitator and of a Community-wide Task Force.

The negative statements regarding the Facilitator were directed, primarily, at its limited role. For instance, the CFT proposed that the Facilitator be empowered to submit recommendations to the Court about the means to be used to reduce racial isolation. Tr. at 149. Others suggested that the agreement be modified to require the Facilitator to file monthly reports. Tr. at 90; 95.

The Court does not concur with these criticisms of the Facilitator. Under the agreement, the Cincinnati Defendants are given wide discretion in choosing the means to reach the Taeuber Index levels to which the parties agreed. Consequently, it is of little importance that the Facilitator cannot (unless the Court so requests) make recommendations which are inconsistent with that provision. Likewise, the absence from the proposed agreement of a specific

timetable establishing when the Facilitator is to file reports does not weaken it. The proposed settlement agreement requires the submission of *timely* reports. This is a sufficiently definitive directive.

The criticisms of the Community-wide Task Force were basically two-fold. Some commentators wanted its membership expanded so that other groups could either appoint members to it or be represented on it. Others suggested that the Task Force be given a broad role in overseeing the implementation of the proposed agreement.

The Court disagrees with both of these criticisms. The size of the Task Force is reasonable. A 40 or 50 member Task Force, as some suggested, would become unwieldy. In addition, the Task Force is to represent a broad cross section of the community. To allow various narrow interest groups to appoint one or more members to it would detract from this salutary purpose. Additionally, the Court does not feel that it is necessary to require the parties to renegotiate the proposed settlement agreement in order that the Community-wide Task Force might become a super board of education for the Cincinnati Public School System.

Although the Court has not commented upon every statement that it received, all have been thoroughly considered. Once again, the Court commends those who both submitted written statements and/or attended the fairness hearing to make oral presentations. The commentary was thoughtful, informed and sincere. Cincinnati can be justly proud of its citizenry.

7. The public interest.

The final factor for the Court to consider is whether the settlement is consistent with the public interest. *Williams v. Vukovich, supra,* 720 F.2d at 923. The proposed agreement is unquestionably in the public interest. It brings to a close more than ten years of litigation. It settles what was a divisive issue within the Cincinnati community. A trial of this case would be even more divisive because counsel for each party would advocate their theories to the

extent propriety would allow. The settlement avoids that potentiality.

As the Sixth Circuit said in *Williams v. Vukovich, supra:*

Voluntary compliance will frequently contribute to the ultimate achievement of the public objectives. Consent decrees minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt.

720 F.2d at 923 (citation omitted).

It goes without saying that this is an extremely important lawsuit which, regardless of how this Court would have decided it, would have gone far toward shaping the quality of education received by schoolchildren in the Cincinnati public schools and, therefore, to a very large degree, the quality of life enjoyed in Cincinnati for the next quarter century and beyond.

In lawsuits, generally, and in an extraordinarily significant lawsuits such as this one, specifically, settlement negotiations must take place for the simple reason that a good settlement, fair to all sides, is infinitely preferable to the risk or the reality of a bad result at trial. Quite frankly, in a case of this magnitude, in a case with this community-wide significance, *neither* party can *afford* to lose, because when one side of the case loses, regardless of which party that is, the entire community is the loser; neither party can afford to *win*, because when one party wins, regardless of which party to the lawsuit that is, the other side loses and the entire community is the loser. This realization led the negotiators to the bargaining table and kept them at their task until an agreement was reached.

By settling this lawsuit, the public, and the parties, have avoided the risks inherent in either side winning or losing this lawsuit.

The Plaintiffs and the Cincinnati Defendants have requested that this Court strike from the agreement the language contained in Section 12 thereof, to the effect that during the term of the agreement, compliance with the agreement shall be deemed to be compliance with the Fourteenth Amendment of the United States Constitution, on the basic premise that said language is unenforceable. The State Defendants object to this Court's striking of said language. *See* doc. #721 at 4.

Feeling that terms which the parties have chosen should not be stricken, this Court will decline to strike this or any term from the agreement. In the future, should the practical application of this language ever become at issue, this Court will interpret same both in the context in which it appears in the agreement and within the basic premise that the language was not intended by the drafters thereof to give the Defendants a license to commit constitutional violations.

The Court has assessed the proposed settlement agreement by considering all requisite factors. This process leads the Court to but one possible conclusion. The proposed settlement agreement is a fair, reasonable and adequate resolution of Plaintiffs' allegations.

Accordingly, the Court hereby adopts the proposed settlement agreement as a consent decree. Further, the Court orders this action against the State Defendants and the City Defendants dismissed with prejudice. The Court shall retain jurisdiction over the consent decree during its term. *See Williams v. Vukovich, supra,* 720 F.2d at 920; *Stotts, supra,* 679 F.2d at 553.