Sidney KOGAN, Trustee, pursuant to a Declaration of Trust dated November 27, 1967, as amended, and William Farber, on behalf of themselves and the Plaintiff Class, Plaintiffs,

v.

AIMCO FOX CHASE, L.P., a Delaware limited partnership, AIMCO Holdings, L.P., a Delaware limited partnership, AIMCO Holdings, QRS, Inc., a Delaware corporation, Defendants,

and

AIMCO Properties, L.P., a Delaware limited partnership, AIMCO–GP, Inc., a Delaware corporation, Apartment Investment and Management Company, a Maryland corporation, the National Housing Partnership, a District of Columbia limited partnership, and the National Corporation for Housing Partnerships, a Delaware corporation, Defendants and Third–Party Plaintiffs,

v.

Morton Sarubin, an individual, Third–Party Defendant.

No. 98–CV–73230–DT.

United States District Court, E.D. Michigan, Southern Division.

May 30, 2000.

Richard A. Bone, David S. Snyder, Sheri B. Cataldo, Sullivan, Ward, Southfield, MI, for Sidney Kogan, William Farber, plaintiffs.

Larry J. Saylor, Miller, Canfield, Detroit, MI, Steven A. Velkei, Skadden, Arps, Los Angeles, CA, for AIMCO Properties, L.P., AIMCO–GP, Incorporated, Apartment Investment and Management Company, National Housing Partnership, National Corporation for Housing Partnerships, defendants.

Richard W. Paul, Michelle V. Thurber, Dickinson, Wright, Detroit, MI, for Morton Sarubin, third-party defendant.

## ORDER APPROVING SETTLEMENT OF CLASS ACTION

ZATKOFF, Chief Judge.

### I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Final Approval of Settlement in this class action and Application of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses. The Court gave preliminary approval to the settlement agreement on January 31, 2000. On May 22, 2000, a fairness hearing was conducted. For the reasons stated below, the settlement of the class action is APPROVED, the matter is DISMISSED WITH PREJUDICE, and the Application of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses is GRANTED.

### II. BACKGROUND

#### A. THE PARTIES

This action arises out of the sale of an apartment project located in Alexandria, Virginia known as Foxchase and formerly owned by First Alexandria Associates (hereinafter "FAA"). Plaintiffs are those limited partners of FAA who did not tender their interest to AIMCO Properties after the sale of Foxchase. Defendant National Housing Partnership (hereinafter "NHP") is the general partner of FAA. Defendant National Corporation of Housing Partnerships (hereinafter "NCHP") is the general partner of NHP.

Apartment Investment and Management Company (hereinafter "AIMCO") conducts substantially all of its operations through AIMCO Properties and other affiliates and

subsidiaries. Defendant AIMCO Foxchase was the ultimate purchaser of the Foxchase Property. Defendant AIMCO Holdings is the general partner of AIMCO Foxchase. Defendant AIMCO Holdings QRS is the general partner of AIMCO Holdings. It was through Defendant AIMCO Properties that AIMCO acquired the FAA limited partnership interests. Defendant AIMCO–GP is the sole general partner of AIMCO Properties. All of the named Defendant AIMCO entities are either subsidiaries of AIMCO or are controlled by AIMCO. Unless otherwise noted, the various Defendant AIMCO entities will be collectively identified as "AIMCO".

## B. THE OFFERING MEMORANDUM

In 1980, NHP, through its general partner NCHP, solicited plaintiffs and other investors by sending a copy of the private placement memorandum (hereinafter "PPM") to select investors around the country. NHP marketed the partnership interests to sophisticated investors with a net worth in excess of $400,000.00 (exclusive of homes, home furnishings, and automobiles), and a guaranteed income stream. Attached to the PPM was the FAA Partnership Agreement (hereinafter "Partnership Agreement") and the FAA Investor Purchase Agreement (hereinafter "Purchase Agreement"), as well as financial forecasts and projections. The PPM informed the prospective investors that the units to be purchased were subject to the terms of the Partnership Agreement and the Purchase Agreement, and admonished the investors to read both documents with care. Further, the PPM disclosed to the prospective investors the possibility that the Foxchase Property could be sold. Indeed, the PPM projected a sale after the end of the 1999 calendar year.

## C. THE PARTNERSHIP AGREEMENT

The Partnership Agreement gave NHP authority to operate and manage the Partnership, subject to certain exceptions. The Partnership Agreement authorized NHP to "buy, own, manage, sell, lease, or otherwise acquire or dispose of all or any part of the Partnership's assets." It also authorized NHP to enter into transactions with affili-

ates, including those who "control, are controlled by, or are under common control" of any partner. Thus, NHP or an affiliate possessed the right to purchase the Foxchase Property, subject to approval.

## D. THE PURCHASE AGREEMENT

The FAA Purchase Agreement set forth the terms and conditions for investment and incorporated the Partnership Agreement provisions. Each investor was required to sign the Purchase Agreement as a condition of investment.

The Purchase Agreement gave NCHP the right to receive a disposition fee in event of a sale or refinancing. If the property was sold or refinanced, then NCHP was entitled to 10% of the "gross consideration paid to the Partnership (including mortgages and other debts assumed and fees paid)." Section 9(3) of the Purchase Agreement, referred to as the "waterfall provision," set forth the order for payment of proceeds in the event of a sale. NCHP was entitled to the first half of the fee once sufficient proceeds were set aside to pay Partnership receivables and to pay investors the "Investors Purchase Price for Units." NCHP was entitled to the second half of the fee once sufficient money was set aside for any tax liabilities owed by investors because of the sale. Section 10 of the Purchase Agreement grants NHP a power of attorney for the individual investors to receive distributions from the partnership and disperse the funds appropriately.

## E. AIMCO'S INVOLVEMENT IN THE PARTNERSHIP

AIMCO is a publicly traded real estate investment trust ("REIT") which owns, acquires, develops and manages multifamily apartment buildings. In 1997, AIMCO and its affiliates acquired the various NHP entities through a series of integrated transactions. AIMCO first purchased a controlling interest in the property management company, NHP and thereafter merged it with a wholly owned subsidiary. AIMCO also acquired NHP's real estate assets through its purchase of 100% of the stock of NHP Partners, Inc. for $54.8 million. By virtue of this

purchase, AIMCO became the parent company of NCHP.

## F. SALE OF THE FOXCHASE PROPERTY

After AIMCO acquired NHP, officers of the two companies met in the first quarter of 1997 to negotiate a value for the real property owned by the limited partners affiliated with NHP, including FAA. After negotiations, the officers from AIMCO and NHP valued the Foxchase Property at $110,268,270.00 (inclusive of outstanding indebtedness).

Four months later, the real estate appraiser Aaron & Wright prepared an independent appraisal of the Foxchase Property. The purpose of the appraisal was "to estimate the market value" of the Foxchase Apartments over the next twelve months. The appraised value, $110,000,000.00, was similar to the value negotiated between NHP and AIMCO.

On August 12, 1997, AIMCO published a PPM in which it offered to purchase any and all outstanding limited partnership interests in FAA. AIMCO disclosed that NHP was a subsidiary to AIMCO and NHP would sell the Foxchase Property to AIMCO if it acquired enough interests (51%) to approve the sale. AIMCO disclosed that it would purchase the Foxchase Property for $110,268,270.00. AIMCO offered limited partners the liquidation value of their interests based upon the $110,268,270.00 negotiated value and the Aaron & Wright appraised value.

By December 1, 1997, limited partners in the Foxchase I[1] Property had tendered 262 units representing 49.26% of the total outstanding Percentage Interests and limited partners in the Foxchase II Property had tendered 8.125 units, representing 3.38% of the total outstanding Percentage Interests. Accordingly, AIMCO had obtained approximately 52.4% of the limited partnership interests. Thereafter, AIMCO and NHP executed the Twenty–Eighth Amendment to the Partnership Agreement (hereinafter "28th

Amendment"), which inter alia, purported to admit AIMCO as a limited partner holding approximately 52% of the total limited partnership interests.

Over the objections of some of the limited partners, AIMCO and NHP proceeded with the announced plan to sell the Foxchase Property to AIMCO OP for $110,268,270.00. The sale was completed on December 1, 1997, with NHP voting its general partnership interest and AIMCO voting the majority of the limited partnership interests in favor of the sale. The parties structured the transaction as a tax deferred exchange to prevent limited partners from recognizing any gain on the sale. Instead of cash, NHP accepted an equivalent value of limited partnership interests in AIMCO OP (hereinafter "OP Units"). OP Units are redeemable for AIMCO Common Stock, listed on the New York Stock Exchange, on a one-for-one basis or for an equivalent cash amount.

Net consideration from the sale of the Foxchase Property equaled nearly $46 million (after adjusting for the assumption of a $70 million mortgage and various other closing adjustments). From that amount, NCHP received a credit of 10% of the purchase price, or $11,026,827, as the Disposition Fee. The balance of the purchase price ($34,462,429.00) was transferred to FAA in OP Units and allocated to limited partners in accordance with their respective interests under the Twenty–Ninth Amendment to the Partnership Agreement (hereinafter "29th Amendment").[2] The 29th Amendment allowed each investor to "control his or her own destiny" by deciding when to liquidate his or her share, if at all. The 29th Amendment permitted a limited partner to redeem his or her allocated share of OP Units at current market value, with a guaranteed minimum price of $35.13 per unit. Therefore, the limited partners receive a guaranteed return of over $65,000 per unit in Foxchase I (based upon an allocated share of 1863.44764 OP Units per each unit in Fox-

---

1.  Foxchase I is the first phase of the Foxchase Property development.

2.  The Twenty–Ninth Amendment is nearly identical to the Twenty–Eighth Amendment and was

implemented to correct a mistake in the prior amendment regarding the number of OP Units allocated to each unit in FAA.

chase I) and over $144,000.00 in Foxchase II (based upon an allocated share of 4129.98147 OP Units per each unit in Foxchase II).

## G. PROCEDURAL HISTORY

Plaintiffs filed the original complaint on July 24, 1998, which was based upon the sale of Foxchase and the disposition fee. The complaint also included a Motion for Class Certification. Plaintiffs alleged several theories in the complaint, including fraudulent misrepresentation, negligent and/or innocent misrepresentation, violation of various securities laws, breach of fiduciary duty, civil conspiracy, negligence, and breach of contract. Plaintiffs filed their First Amended Complaint on October 6, 1998, which contained the following claims: breach of fiduciary duty, breach of contract, negligence, conversion, and interference with advantageous contractual relationships. On October 16, 1998, a third-party complaint[3] was filed by the defendants in the original action against Morton Sarubin, Phyllis P. Sarubin, Flora Sarubin Stelzer, Judith Sarubin Kvasnovsky, and Leslie Sarubin Ries. The third-party complaint requested declaratory relief and equitable indemnification.

On March 25, 1999, plaintiffs filed a motion to file a Second Amended Complaint in order to add three new parties to the case. The new parties were AIMCO Foxchase, L.P., AIMCO Holdings, L.P., and AIMCO Holdings QRS, Inc. The Court granted plaintiffs' request on March 31, 1999. This complaint alleged the following claims: breach of fiduciary duty, breach of contract, violations of various securities laws, negligence, gross negligence, conversion, and interference with advantageous contractual relationships. In response, defendants filed a motion to dismiss the claims against the newly named defendants under Fed.R.Civ.P. 12(b)(6). On August 3, 1999, this motion was granted in part and denied in part.

In the meantime, plaintiffs and defendants had filed motions for summary judgment. A hearing was set for these motions on October 19, 1999. Approximately three weeks before the hearing, the parties notified the Court that they had reached a tentative settlement in the case. Consequently, the hearing was postponed indefinitely and the parties were given time to work out the details of the settlement agreement.

## H. THE SETTLEMENT AGREEMENT

Basically, to settle this class action, defendants agreed to pay the class $4,000,000. One-third of the settlement was to be paid in cash, and the remainder was to be paid in AIMCO OP units. During the fairness hearing, counsel for plaintiffs and defendants discussed at length the terms of the settlement agreement. Plaintiffs' counsel explained that each member of the class that receives AIMCO OP units[4] will be able to convert these units into AIMCO stock, which is publicly traded on the New York Stock Exchange, after holding them for one day. At that point, the class members would have the option of either holding the AIMCO stock or selling it. In addition, defendants' counsel explained that the value of the AIMCO stock cannot drop below $35.13. If the value of the stock does in fact drop below this amount, AIMCO pays the difference to the class member.

Plaintiffs' counsel also explained that there were three different categories of class members. The class was defined, essentially, as those persons that were limited partners in First Alexandria Associates as of August 12, 1997. The first category were those that purchased their interest in 1980. The second category included persons that purchased their interest in 1984. Finally, the third category included six class members that redeemed their interest after August 12, 1997. Counsel explained that because these six class members had already redeemed their interest, they were ineligible to receive

---

3. This complaint was dismissed on November 3, 1999 by stipulation of the parties.

4. Plaintiffs' counsel explained that a formula has been agreed upon to determine the number of AIMCO OP units that would be transferred by defendants to the class. Although the value of each individual AIMCO OP unit may vary, defendants will nonetheless issue an additional number of shares equal to $2,512,271.50 divided by the value of a "REIT" share, which is a share of AIMCO's Class A Common Stock.

AIMCO OP units. Consequently, these six class members were to be paid in cash,[5] which was to be distributed on a pro rata basis.

## I. NOTICE OF THE SETTLEMENT

On January 31, 2000, the Court entered an order giving preliminary approval to the settlement agreement. Further, the order approved the form of the notice that was to be submitted to the class members and a date for a fairness hearing was set. Subsequent to this order, the members of the class were notified[6] of the settlement agreement. The notice set forth a description of the litigation and a description of the proposed settlement. Further, the notice provided that up to one-third of the $4,000,000 paid by defendants would be used to satisfy plaintiffs' counsels' attorney fees and expenses.

Sometime after notice was sent to the class members, and shortly before the fairness hearing, the Court was notified that six class members had not received notice due to an oversight. Therefore, on April 10, 2000, the Court entered a second order which required that six class members that had failed to receive notice of the settlement agreement were to be notified. Further, the order stated that the fairness hearing would be held on May 22, 2000. Finally, the remainder of the class that had previously received notice was informed of the new date for the fairness hearing.

## J. THE FAIRNESS HEARING

On May 22, 2000, a fairness hearing was held before the Court. Plaintiffs' counsel spoke about issues such as the procedural history of the case, the settlement negotiations, the settlement agreement, and attorney fees. Defense counsel also discussed some issues concerning the settlement agreement.

Most importantly, no one appeared at the fairness hearing to object to the settlement agreement. Further, the Court received no written objections to the settlement agreement. Plaintiffs' counsel mentioned that he had been called by an attorney representing two of the class members. Plaintiffs' counsel stated that it was obvious from his questions that this attorney was very familiar with the case. However, plaintiffs' counsel stated that this attorney did not object to the settlement agreement. Finally, plaintiffs' counsel discussed the numerous calls that he had received from class members expressing their satisfaction with the settlement agreement.

## III. APPROVAL OF THE SETTLEMENT AGREEMENT

### A. LEGAL STANDARDS

Pursuant to Fed.R.Civ.P. 23(e), a class action "shall not be dismissed or compromised without the approval of the court." "The district court may not approve a settlement unless it determines after hearings that the settlement is fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990).

The Court must examine "the complexity, expense and likely duration of the litigation, and the stage of the proceedings and the amount of discovery completed." *Bronson v. Board of Educ.*, 604 F.Supp. 68, 73 (S.D.Ohio 1984). "Additionally, when significant discovery has been completed, the Court should defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Bronson*, 604 F.Supp. at 73 (citing *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir.1983)). The Court must also make sure that any settlement is the product of arm's length negotiations as op-

---

5. In Exhibit A of the Stipulation of Settlement of Class Action, the six class members that were to receive cash were identified as follows: Ed–Allene Family Ltd. Partnership ($43,257.01), Ambrose H. Hardwick, Jr. ($10,814.25), Paul H. Oreffice ($43,257.01), Saul Ritzenberg ($43,-257.01), Norman Rockoff ($10,814.25), and Veronica T. Pickman–Meneely ($2,995.97).

6. On May 16, 2000, the affidavit of Paul Schulman was submitted to the Court. Schulman is the Vice President of Corporate Investor Communication, Inc., which has been engaged in the business of distributing class action notices for approximately twenty-five years. The affidavit detailed the manner in which the members of the class were notified of the settlement agreement.

posed to collusive bargaining. *Bronson,* 604 F.Supp. at 73.

■ The Court should carefully consider any objections raised by class members, but approval need not be withheld simply because some class members object to the terms of the settlement. *Bronson,* 604 F.Supp. at 73. Approval should also not be withheld merely because the amount of the settlement is less than what a successful plaintiff would have received at the conclusion of a fully litigated case. *Id.* at 74. In addition to these requirements, the Court does not resolve any factual or legal issues that are the basis of the underlying lawsuit. *Id.* at 73–74. The Court must also be satisfied that the proposed settlement is in the public interest. *Id.* at 74.

Finally, the *Manual for Complex Litigation* also lists some other considerations:

- the named plaintiffs are the only class members to receive monetary relief, or are to receive relief that is disproportionately large;
- the settlement amount is much less than that sought in the complaint or indicated by preliminary discovery;
- major claims or types of relief sought in the complaint have been omitted from the settlement;
- particular segments of the class are treated significantly differently from others;
- claimants who are not members of the class are treated significantly differently;
- many class members object to the settlement; and
- apparently cogent objections have been raised.

*Manual for Complex Litigation* § 30.42 (3d ed.1995).

## B. ANALYSIS

■ At the outset, the Court considers the fact that not one class member objected to the settlement agreement to be most persuasive. No class members filed written objections, nor did any class members appear at the fairness hearing to object to the settlement agreement. The members of the class were provided with notice of the settlement agreement. The affidavit of Paul Schulman sets forth in detail the manner in which the class was notified about the settlement agreement. The Court finds that the notice provided to the class was the best possible notice and reasonably apprized class members of the settlement agreement. Consequently, the Court finds the fact that not one class member objected after receiving the best notice possible under the circumstances to weigh heavily in favor of approving the settlement agreement.

Looking at some of the other factors, the Court finds that these also weigh in favor of approving the settlement agreement. There is no doubt that this case involved complex legal and factual issues. A review of the discussion of plaintiffs' complaints demonstrates that numerous legal theories were asserted by plaintiffs, including claims of breach of fiduciary duty, breach of contract, violations of various securities laws, negligence, gross negligence, conversion, and interference with advantageous contractual relationships. Further, extensive discovery had taken place in this matter. This was not a situation in which plaintiffs' counsel decided to settle the matter after a brief inquiry. Instead, more than 10,000 pages of documents were produced, four sets of interrogatories were served, depositions were taken in various places, including Washington, D.C., Denver, and Houston, and many experts were consulted. Given this extensive discovery, the Court is mindful that it "should defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Bronson,* 604 F.Supp. at 73.

Further, the Court finds that the settlement agreement was the product of arm's length negotiations. Plaintiffs' counsel described the proceedings as "bitterly contested" and "vigorously opposed." Further, throughout the case, there were continued attempts to settle the matter. Plaintiffs' counsel stated that he and defendants' counsel would speak from time to time about settlement. Eventually, defendants' counsel persuaded plaintiffs' counsel to come to Colorado to discuss settlement. The possibility of settlement was discussed for a day with no agreement. However, the parties continued

to discuss settlement after this meeting and eventually an agreement was reached. It is clear that the decision to settle was not a snap judgment on plaintiffs' counsels' part. Instead, it as the product of long and thorough negotiations.

■ Looking at the specific terms of the settlement agreement, the Court would note that the named plaintiffs are not the only persons to receive monetary relief. Instead, the proceeds of the settlement agreement will be distributed to the class members on a pro rata basis. Although the two named plaintiffs are to receive $4,500 in addition to their pro rata share, plaintiffs' counsel explained that this was to compensate them for their work on the case, which included being deposed and advising plaintiffs' counsel about the case. The Court does not believe compensating the named plaintiffs with an additional $4,500 renders the settlement agreement unfair.

As to the amount of the settlement, the Court was impressed with plaintiffs' counsel's statement that $4,000,000 represented 80% of what he believed were "provable damages." In addition, the class members will retain their initial investment and receive an amount equal to 25% of their original investment in either cash or OP units. The Court finds that such a settlement cannot be considered "much less" than the damages sought in the complaint.

Another factor to consider is whether class members are treated differently from one another. As previously discussed, the six class members that sold their interest after August 12, 1997 will receive their settlement in cash as opposed to the majority of the class, which will receive their settlement in AIMCO OP units. As explained at the hearing, the cash payment to these six class members was necessary since they were ineligible to receive AIMCO OP units due to the fact that they had already redeemed their interest. Nonetheless, the amount to be received by these six class members is their pro rata share, based upon their investment. Further, although the majority of the class is to receive AIMCO OP units, these units can be quickly converted into AIMCO stock and then to cash. Therefore, although some class members are to receive their settlement in cash, the Court finds that due to the speed in which the AIMCO OP units may be converted to cash, the class members are not being treated "significantly differently."

After reviewing many factors, the Court is convinced that the settlement agreement "is fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey*, 908 F.2d at 42. Again, in making this determination, the Court is greatly persuaded by the fact that none of the class members objected to the settlement agreement. Consequently, the Court hereby APPROVES the settlement agreement.

## IV. APPROVAL OF ATTORNEY FEES AND COSTS

As discussed previously, the attorneys in this matter have agreed to settle for $4,000,-000. One-third is to be paid in cash ($1,333,-333), and the remaining two-thirds is to be paid in AIMCO OP units. In conjunction with the settlement agreement, plaintiffs' counsel has requested that the Court: (1) grant them attorney's fees in the amount of $1,240,000; (2) grant them $83,909.36 in out-of-pocket costs; and (3) grant $4,500 to each of the named plaintiffs for services rendered.

■ When reviewing an award of attorney's fees in a common-fund case, the Sixth Circuit requires that the award must be reasonable under the circumstances. *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993). The Sixth Circuit has delineated six factors to consider when determining whether an award of attorney's fees is reasonable:

(1) the value of the benefit rendered to the [class], (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of counsel involved on both sides.

*Smillie v. Park Chemical Co.*, 710 F.2d 271, 275 (6th Cir.1983).

As to the first factor, plaintiffs' counsel asserts that the settlement of $4,000,000 represents approximately 80% of their provable damages. Plaintiffs' counsel also cites numerous decisions to demonstrate that their results exceed the recoveries obtained by other class counsel in similar class actions. The Court finds that this factor weighs in favor of granting plaintiffs' counsel the requested attorney fees because the Court believes plaintiffs' counsel rendered a substantial benefit to the class.

The second factor is whether the award would serve as an incentive to other attorneys to take on similar cases. The Court is of the opinion that the amount of attorney fees requested by plaintiffs' counsel is substantial and therefore, would create an incentive for other attorneys to take on similar cases. Consequently, this factor weighs in favor of granting plaintiffs' counsel their award.

The third factor is whether plaintiffs' counsel were to be compensated on a contingency fee basis. This factor also weighs in favor of granting the requested fees. Plaintiffs' counsel undertook this action on a contingency fee basis and made significant cash outlays to finance it. Further, plaintiffs' counsel addressed at length the risks they assumed by taking this case on a contingency fee basis. Finally, the Court would note that the notice sent to the class members informed them that the attorney fees and expenses could total as much as one-third of the settlement amount and not one class member objected.

The fourth factor to consider is the value of plaintiffs' counsels' services on an hourly basis. Plaintiffs' counsel estimate that they spent approximately 2400 hours working on this case. Billing on a straight hourly basis would have resulted in fees of $561,434.50 for plaintiffs' counsel. The Court finds that the substantial amount of work done by plaintiffs' counsel and the value of that work on an hourly basis also weighs in favor of granting plaintiffs' counsels' request.

The fifth factor looks to the complexity of the litigation. There is no doubt that this class action was very complex. Plaintiffs' counsel was required to understand the various types of law which had an impact on this case, including tax law, securities law, and limited partnership law. Plaintiffs' counsel also had to review more than 10,000 pages of documents produced by defendants. Further, plaintiffs' counsel had to deal with numerous discovery issues and requests, conduct depositions in Colorado, Texas, and Washington D.C., overcome defendants' motion to dismiss, and consult with numerous experts. Therefore, this factor also weighs in favor of granting the request for attorney fees.

The sixth and final factor to consider is the professional skill and standing of counsel. Plaintiffs' counsel assert that they, Sullivan, Ward, Bone, Tyler & Asher, P.C., are nationally recognized practitioners in the field of complex commercial litigation. Further, they represent that they are currently engaged in several additional class actions. Plaintiffs' counsel also notes the skill of defense counsel, Skadden, Arps, Slate, Meagher & Flom, in this matter, one of the largest and most respected law firms in country. Consequently, the Court finds that this factor also weighs in favor of granting the requested attorney fees.

In addition to the attorney fees, plaintiffs' counsel also requests that the Court grant them $83,909.36 in costs. Plaintiffs' counsel has submitted sufficient documentation as to these costs and the Court finds that the costs are reasonable.

Finally, plaintiffs' counsel requests an award of $4,500 for each of the two named plaintiffs. At the fairness hearing, plaintiffs' counsel represented that this was for services rendered by the named plaintiffs, including the time spent advising plaintiffs' counsel on the lawsuit and being deposed. Further, plaintiffs' counsel stated that "it seemed only fair" that the named plaintiffs' receive some additional money because of the time spent on this matter. The Court finds that awarding the named plaintiffs an addition $4,500 is fair, considering the extra time and effort they put into the litigation.

In sum, the Court finds the requested attorney fees, costs, and awards for the named plaintiffs to be fair and reasonable under the circumstances in this case. Conse-

quently, the attorney fees, costs, and awards for the named plaintiffs are hereby GRANTED.

## V.  CONCLUSION

For the reasons discussed above, the settlement agreement is APPROVED and this matter is DISMISSED WITH PREJUDICE.  Further, the application for $1,240,000 in attorney fees, $83,909.36 in out-of-pocket costs, and $4,500 for each of the named plaintiffs is GRANTED.

IT IS SO ORDERED.